1  IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
2  BEFORE THE HONORABLE MORRISON C. ENGLAND

3  UNITED STATES OF AMERICA,

4  　　　　　　　Plaintiff,
vs.　　　　　　　　　　　Sacramento, California
5  　　　　　　　　　　　　No. 2:15-CR-000190
　　　　　　　　　　　　Monday, July 26, 2021
6  JAMES CHRISTOPHER CASTLE,　9:35 a.m.

7  　　　　　　　Defendant.
_____/
8

9  　　　　　　　　　--oOo--

10  REPORTER'S EXCERPT OF JURY TRIAL

11  TESTIMONY OF TISHA TRITES

12  　　　　　　　　　--oOo--

13  APPEARANCES:

14  For the Government:　　　UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　　　　　AUDREY B. HEMESATH
15  　　　　　　　　　　　　Assistant U.S. Attorney
　　　　　　　　　　　　　TANYA B. SYED
16  　　　　　　　　　　　　Assistant U.S. Attorney
　　　　　　　　　　　　　501 I Street, Suite 10-100
17  　　　　　　　　　　　　Sacramento, CA  95814

18  For the Defendant:　　　ORTIZ LAW GROUP, PC
　　　　　　　　　　　　　JESSE ORTIZ, III
19  　　　　　　　　　　　　Attorney at Law
　　　　　　　　　　　　　1510 J Street, Suite 100
20  　　　　　　　　　　　　Sacramento, CA  95814

21  Official Reporter:　　　KACY PARKER BARAJAS
　　　　　　　　　　　　　CSR No. 10915, RMR, CRR, CRC
22  　　　　　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　　　　　　501 I Street
23  　　　　　　　　　　　　Sacramento, CA  95814
　　　　　　　　　　　　　kbarajas.csr@gmail.com
24

*Proceedings recorded by mechanical stenography.  Transcript*
25  *produced by computer-aided transcription.*

1          SACRAMENTO, CALIFORNIA, MONDAY, JULY 26, 2021, 9:35 AM

2                              --oOo--

3          THE CLERK:  Calling criminal case 15-190,

4  United States versus James Castle on for jury trial day 4, your

5  Honor.

6          THE COURT:  Thank you.

7          And good morning ladies and gentlemen.  For the

8  record, all of the jurors are present along with the two

9  alternates.

10         And Counsel, are we ready to proceed?

11         MS. HEMESATH:  Yes, your Honor.

12         THE COURT:  Defense as well?

13         MR. ORTIZ:  Yes, your Honor.

14         THE COURT:  All right.  Good morning, ma'am.  Make

15  sure everything is working.  You took an oath to tell the

16  truth, the last time you were here; do you recall that?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  And that oath is still binding upon you

19  here today; do you understand that as well?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  All right.  Very well.  Thank you.

22         You may proceed.

23         MS. HEMESATH:  Thank you, your Honor.

24         I actually would like to begin this morning by

25  admitting several exhibits that are certified business records.

1  They are bank signature cards.  That's Government's Exhibit --

2  another list -- 6, 7, 8, 11, 14, and 15.

3        THE COURT:  Did you get all those?

4        THE CLERK:  Yes, your Honor.

5        MR. ORTIZ:  No objection, your Honor.

6        THE COURT:  No objection.  Those will be admitted.

7        (Government's Exhibits 6, 7, 8, 11, 14, and 15 were

8  admitted into evidence.)

9        MS. HEMESATH:  Thank you, your Honor.  And I missed

10 one certified public document from before, that's 405.  Move to

11 admit.

12       MR. ORTIZ:  No objection.

13       THE COURT:  Admitted.

14       (Government's Exhibit 405 was admitted into evidence.)

15       MS. HEMESATH:  All right.  Thank you.

16                      TISHA TRITES

17 was called as a witness, and having been previously duly sworn,

18 was examined and testified as follows:

19                RESUMED DIRECT EXAMINATION

20 BY MS. HEMESATH:

21 Q.  All right.  Good morning, Ms. Trites.

22 A.  Good morning.

23 Q.  I would like to pick up approximately where we left off

24 last time, and if we could go ahead and put up side by side on

25 the screen Government's Exhibit 728 with 704.

1          And while those are coming up, I want to orient you a

2    little bit into the part of the process which is the recorded

3    reconveyances at the county recorder's offices.

4          Remind us again what was the function of these documents

5    in your program?

6    A.   Those would remove any existing deed of trust or mortgage

7    from the property.

8    Q.   Okay.  And how important was it --

9               THE COURT:  Excuse me.  The monitor is not working.

10              THE CLERK:  This one, your Honor?  Hold on one second.

11   BY MS. HEMESATH:

12   Q.   Okay.  How important was it in the program to get the bank

13   right on these recorded deeds?

14   A.   If the correct bank wasn't listed there, then when the

15   property went to title and escrow, the mortgage wouldn't show

16   as being paid.  It wouldn't be removed.

17   Q.   Did you, yourself, file any of these deeds of reconveyance

18   at the county recorder's office?

19   A.   I'm sure that I did, yes.

20   Q.   Okay.  The majority of them, were you involved in the

21   filing at the county recorder's office?

22   A.   No.  Only the ones that were filed down in San Diego.  I

23   think I may have recorded one or two up in Orange County, but I

24   didn't fly up to the other places to record them, no.

25   Q.   Okay.  Did you understand that other people would be doing

1   so as part of the program?

2   A.   Absolutely.

3   Q.   Okay.  At whose direction was it that other people in the

4   program were filing these recorded deeds?

5   A.   It was part of the process.  So it would have been at

6   Chris's direction, but more specifically, probably the

7   franchisee-type person would have been the one directing it to

8   get done.

9   Q.   Okay.  So did you know Victoria Hernandez who signed on

10  this one?

11  A.   No.  I did not.

12  Q.   Okay.  Even not knowing her, as you sit here today or

13  actually as you sat in your home in 2010, did you know whether

14  she actually worked at HSBC Bank?

15  A.   I do not know her personally, but I would seriously doubt

16  that she did.

17  Q.   At any point in your program in 2010-2011, did you have

18  conversations with Mr. Castle about getting real

19  representatives from the banks to sign these documents?

20  A.   No.

21  Q.   Why not?

22  A.   I don't know.  The conversation never came up.  But it was

23  always my understanding that the person signing this was an

24  authorized representative that was fictitious.

25  Q.   Just for the record, you did "authorized representative"

1   in air quotes?

2   A.   Air quotes, yes.

3   Q.   Is that because they were really not authorized

4   representatives of the bank?

5   A.   Correct.

6   Q.   All right.  Let's do one more.  Let's do side by side

7   Government's Exhibits 728, page 3 and then on the other side

8   Exhibit 702.  So that one that just came up on the left-hand

9   side, if you recall from last week, I believe the testimony was

10  this is a draft version of whoever is making this template for

11  the Cromwell Drive home.  Does that sound familiar?

12  A.   Yes.

13  Q.   Okay.  And then on the right, with the recorder's stamp,

14  that's how it actually got filed?

15  A.   That would be correct, yes.

16  Q.   Okay.  If we could go back out to the bank document again.

17  Thank you.

18       So on the left here, while it's still in draft form, John

19  Doe is the authorized representative?

20  A.   Correct.

21  Q.   And then on the right John Doe becomes who?

22  A.   Rudy Garcia.

23  Q.   And did Rudy Garcia actually work for Chase Home

24  Finance?

25  A.   Not to my knowledge.

7

1   Q.   Would you have known, in your role in this program, if on

2   any of these documents you did have actual bank representatives

3   signing these deeds of reconveyance?

4            MR. ORTIZ:  Objection.  Calls for speculation.

5            THE COURT:  Overruled.

6            THE WITNESS:  As far as I'm aware, none of the signers

7   had authorization from the banks.

8   BY MS. HEMESATH:

9   Q.   And I just want to probe a little bit about how you would

10  have been aware of that.  Did you have communication with all

11  of the people on the tops of these different franchises below

12  you?

13  A.   Are you referring to like Patricia Ramos or like the

14  George Larsens, Al Kirkpatricks.

15  Q.   Can you talk us through the different levels in the

16  program who was involved.

17  A.   So Patricia Ramos was more than likely a homeowner.  I

18  don't know her in any other capacity.  The reason that I

19  believed that none of the people were authorized

20  representatives, one document in this process was also a power

21  of attorney that was signed by the homeowner appointing, in

22  this case, Rudy Garcia as their authorized representative.  So

23  that would lead me to believe that no one had actual

24  authorization from the banks.

25  Q.   I see.  So in other words, you weren't picking who signed

1    here as the -- and I'll do it in quotes again -- authorized

2    representative?

3    A.    No.   That would have been at the franchisee level more

4    than likely.   So Al Kirkpatrick, George Larsen, Chris Castle,

5    Larry Todt, any number of people probably made those

6    decisions.

7    Q.    Okay.   This house on Cromwell Drive, do you recall if it

8    sold?

9    A.    I do not specifically recall if it sold.

10   Q.    Let's look at what's already in evidence, Exhibit 727.   If

11   we could just make that a little bigger, thank you.

12        Do you see that Cromwell Drive address up there?

13   A.    Yes.

14   Q.    Does this spreadsheet tell you anything about whether the

15   property sold?

16   A.    It tells me that it more than likely closed escrow.   This

17   information would have come from -- partly from the HUD-1 which

18   would have been the last statement that would have come out of

19   escrow just prior to the sale closing.   So I would believe that

20   it did in fact close.

21   Q.    Okay.   And what does this section down here tell you about

22   the sales proceeds?

23   A.    How the proceeds were divided between CCTT, which would

24   have been Chris Castle, John DiChiara, and myself, as well as

25   Al Kirkpatrick.

1    Q.    Remind us who is Al Kirkpatrick?

2    A.    He was the franchisee who would have been brought in that

3    specific homeowner.

4    Q.    And in order to facilitate this sale, what happened to the

5    real banks who held the mortgage loans?

6    A.    A reconveyance deed was filed to remove them from title

7    and escrow.

8    Q.    And those were the reconveyances we just saw in the

9    previous screens?

10   A.    Yes.

11   Q.    Okay.  All right.  Let's move on to something different.

12   Can you please pull up Government's Exhibit 6, and just try to

13   get this much, kind of this whole top part.

14        All right.  It's a little fuzzy, the text on this scan,

15   but as you're looking at it, do you recognize this document?

16   A.    It looks to be a signature card from Bank of America for

17   the CCTT Group signed by myself and Chris Castle.

18   Q.    All right.  And even tougher but I don't know if you can

19   make out the date, at least the year down there in the date

20   portion?

21   A.    2010 on the top is what it looks like.

22   Q.    Do you remember opening this bank account?

23   A.    Yes, I do.

24   Q.    Can you talk us through the circumstances of that, please.

25   A.    The CCTT Group unincorporated association was a document

1    that Chris Castle gave to me.  We filled it out.  We signed it.

2    We created the unincorporated association.  And we went to Bank

3    of America to open up a bank account.  This specific bank

4    account was opened up through a branch of Bank of America in

5    Lake Tahoe by the name of a person named Jason Calis,

6    C-a-l-i-s.

7    Q.   Okay.  I don't know if we need that level of detail, but

8    you recall going in person to Lake Tahoe to open this bank

9    account?

10   A.   No.  I don't believe we went there in person.  I believe

11   the documents were FedExed to Chris and then to me or vice

12   versa, and we each signed them; and then it was sent back to

13   Jason who completed the opening.

14   Q.   Okay.  And you said you each signed.  So is that in this

15   portion right there?

16   A.   Yes.

17   Q.   And would you mind on your screen touching which of those

18   is your signature?

19   A.   Just with my finger?

20   Q.   Yes.

21   A.   The one on the bottom?

22   Q.   That second one.  Okay.  And whose signature is that above

23   yours?

24   A.   Chris Castle.

25   Q.   Did you affix his signature onto this bank signature

1    card?

2    A.    No.  I did not.

3    Q.    Was it already signed when it was sent to you?

4    A.    I believe it was.  I believe it went to him first.

5    Q.    Okay.  And remind us where geographically were you, and

6    where was he?

7    A.    I was in San Diego, and he was in Petaluma.

8    Q.    And Petaluma is north bay north of San Francisco?  Do you

9    know?

10   A.    Somewhere in the San Francisco-ish area east, I think.

11   Q.    Okay.  Did CCTT do anything other than be a part of this

12   mortgage program?

13   A.    No.

14   Q.    Did any of the money into the CCTT bank account come from

15   anywhere other than this mortgage program?

16   A.    No.  Unless maybe an initial like $100 deposit was

17   required to open it.

18   Q.    Okay.  All right.  Let's pull up Government's Exhibit 11,

19   please.

20        Go ahead and just take a minute and see if you recognize

21   this document.

22   A.    This is also a signature card from Bank of America for

23   CCTT Group and CCTT Forensic Audits signed by Chris Castle,

24   myself, and John DiChiara.

25   Q.    So a different bank account than the one we previously

1    saw?

2    A.    Yes.

3    Q.    Why did you need more than one bank account?

4    A.    I think this one was just adding the forensic audits to

5    it.  So those were held in a separate fund and not commingled

6    with proceeds.

7    Q.    Okay.  And here in the signature section, if we can make

8    that a little bigger.  Thank you.

9          Who is signing onto this bank account?

10   A.    Chris Castle, myself, and John DiChiara.

11   Q.    And what's the date on that?

12   A.    December 1st, 2010.

13   Q.    Remind us geographically where John DiChiara was?

14   A.    In the Grass Valley/Penn Valley area.

15   Q.    Okay.  That's somewhat local here to Sacramento?

16   A.    I believe so, yes.

17   Q.    Okay.  What monies were going to be put into -- I think

18   you just said it, which ones were being put into this bank

19   account?

20   A.    The funds for the forensic audit went into one account,

21   and the proceeds from homes sales went into the CCTT Group

22   account.

23   Q.    That previously one we just saw?

24   A.    Yes, ma'am.

25   Q.    Okay.  What was -- very briefly, what was the idea behind

1    the forensic audits?

2    A.    The forensic audits was a way to track how the mortgage

3    deed and note were separated through -- I forgot the word I'm

4    looking for -- the sale process as those were -- I'm drawing a

5    blank.  I'm so sorry.

6    Q.    Did these forensic audits ever help you in the problems

7    that you encountered in your program?

8    A.    No, they didn't.

9    Q.    But you collected money into this bank account?

10   A.    Yes, we did.

11   Q.    Where did it come from?

12   A.    I believe it came from the homeowners.  It may have also

13   been funded through CCTT.

14   Q.    Was Chris Castle aware that this bank account was being

15   opened?

16   A.    Yes.

17   Q.    Did he sign this document?

18   A.    Yes.

19   Q.    How do you know that?

20   A.    I recognize his signature.  If the document hadn't come to

21   him first with his signature already on it, I would have sent

22   it to him for him to sign.

23   Q.    How about this section here where you've got names and

24   titles, do you see that?

25   A.    Yes.

1   Q.   Who input that information?

2   A.   I assume Chris Castle would have given it to Jason Calis

3   to insert when he created this document and sent it to us.

4   Q.   That's the guy at the bank?

5   A.   Yes, ma'am.

6   Q.   What title did Chris Castle give himself?

7   A.   Director.

8   Q.   And yourself?

9   A.   Secretary.

10  Q.   And John DiChiara?

11  A.   Treasurer.

12  Q.   In your experience in the program, were those accurate

13  descriptions of your various roles?

14  A.   Yes.

15  Q.   DiChiara is listed there as treasurer.  I think when we

16  were talking last week, you described that he was involved in

17  also this church process.  Can you describe for us again what

18  the church entities were and what role they played?

19  A.   The two entities were Shon-te-East-a and the Pillow

20  Foundation.  The homeowners would quitclaim their property

21  title into those entities one or the other.  That gave

22  John DiChiara and, by extension, Chris Castle and myself

23  control over those properties as they went through the sale

24  process through title and escrow.  That way the homeowner

25  didn't have to sign any of the documents.

1    Q.   All right.  Let's look at Government's Exhibit 7, please.

2    Can you make out the text on this one?

3    A.   This is another Bank of America signature card.  CCTT

4    Group and CCTT Legal are listed on it.

5    Q.   So this is a third CCTT bank account?

6    A.   Yes.

7    Q.   Why did you need a third CCTT bank account?

8    A.   We started putting funds from the proceeds of the sale of

9    the properties into a legal fund.  And again --

10   Q.   Why did you do that?

11   A.   We wanted to keep those funds separate, but we were

12   beginning to have issues and wanted to have money to pay

13   attorneys.

14   Q.   And if you look down here at the date, if you can make

15   that out, approximately when did you open this bank account?

16   A.   March 4th, 2011.

17   Q.   So that's later in the program than those two earlier bank

18   accounts we saw?

19   A.   Yes.

20   Q.   Is that consistent in your memory with the time frame of

21   what you said were you were beginning to have problems?

22   A.   Yes.

23   Q.   Okay.  And who are the signers on this one?

24   A.   Chris Castle and myself.

25   Q.   All right.  Did you affix a signature on this?

1   A.   Yes, I did.

2   Q.   You affixed his signature?

3   A.   Oh, no my signature, sorry.

4   Q.   Okay.  Who affixed his signature, if you know?

5   A.   He did.

6   Q.   Let's look at Government's Exhibit 8.  And this is a

7   really unfortunate scan, but can you make out which bank

8   account this is?

9   A.   CJT Financial Group.

10  Q.   What did CJT stand for?

11  A.   Chris, John, Tisha.

12  Q.   All right.  We can go back out.

13       Who were the signatories on this bank account?

14  A.   Myself and Chris Castle.

15  Q.   And what was the purpose of this bank account?

16  A.   I don't specifically recall.

17  Q.   If you look at the date it was opened down there, it looks

18  like July 6th, 2011, so even later in the process.  Does that

19  jog your memory at all as to what this bank account might have

20  been for?

21  A.   Yeah.  I believe the CCTT Group was being flagged by title

22  and escrow, so we opened up a company with a different name,

23  another unincorporated association.

24  Q.   And what titles did you give yourselves in this bank

25  account?

1    A.    Mine, as general manager/secretary and Chris's as

2    assistant manager.

3    Q.    And who signed on this document?

4    A.    I signed and Chris Castle signed.

5    Q.    And let's look at Government's Exhibit 14.  You mentioned

6    previously Oreplex.  What is Oreplex?

7    A.    Oreplex was a company that Chris Castle had.

8    Q.    All right.  Let's go back out.

9          Do you recognize his signature on this document?

10   A.    Yes, I do.

11   Q.    Would you please highlight it for us.

12   A.    Here, here, here.

13   Q.    Where you just marked is not showing for me.  Do you want

14   to try that one more time.

15   A.    Did that work?

16   Q.    Are you seeing the touchscreen?

17   A.    I see the yellow dots.

18   Q.    Okay.  Oh, I do see.  It's just a very faint yellow.  So

19   I'm going to just highlight again.  You see that's his

20   signature right there?

21   A.    Yes.

22   Q.    Okay.  Who is Lara Karakasevic?

23   A.    That was his wife.

24   Q.    And go back out again.

25         And let's look, please, at -- actually side by side, if

1   you don't mind, page 2 of this document, so Government's

2   Exhibit 14, page 2, and I'm going to do that side by side with

3   Government's Exhibit 1601.

4        So coming in here, on the left is going to be page 2 of

5   that Oreplex bank account signature card, and I want you to

6   read for us the address that's listed on that signature card,

7   if you can make it out.

8   A.   1535 Farmers Lane, Santa Rosa, California 95905.

9   Q.   And then on the right, what address is reflected for

10  Oreplex?

11  A.   1535 Farmers Lane, Number 181, Santa Rosa, California

12  95945.

13  Q.   Okay.  So the same address?

14  A.   Yes.

15  Q.   Let's move on to one last bank account, Government's

16  Exhibit 15, and on this one I just want you to tell me if you

17  see that same address again, the 1535 Farmers Lane in

18  Santa Rosa?

19  A.   Yes.

20  Q.   Can you mark for us where?  There we go.  I see the

21  yellow.  All right.

22        And then go back out again.

23        Do you recognize Mr. Castle's signature on this bank

24  account?

25  A.   Yes.

1    Q.    And would you just go ahead and circle for us where.

2          Okay.  You don't have any involvement in this; this is a

3    trust bank account?

4    A.    No.

5    Q.    Okay.  How about that previous one that we saw?  And we

6    can go back to it if you want, Government's Exhibit 14, did you

7    have any involvement in the Oreplex bank account?

8    A.    No.

9    Q.    Okay.  And you're not on the signature card for that bank

10   account?

11   A.    No.

12   Q.    Okay.  Let's look at an email.  Can we please bring up

13   Government's Exhibit 53.  If you can just bring the whole thing

14   a little bigger.

15         So this is an email from who to who?

16   A.    It's an email from me to Chris Castle, John DiChiara, and

17   Eric Zapf.

18   Q.    Who is Eric Zapf?

19   A.    He was a real estate agent that worked for me.

20   Q.    All right.  And without reading us all the numbers in

21   this, what generally are you talking about here?

22   A.    The proceeds from the sale of Ben Riddle's property and

23   how it would break down.

24   Q.    And right here below that you give the break down?

25   A.    Correct.

1    Q.    I want you to read for us your closing sentence on this.

2    A.    "Wires will go out on Monday morning to Eric, Ben &

3    Charles.  Chris and John can take withdrawals from CCTT at any

4    time."

5    Q.    When you say "Chris and John can take withdrawals from

6    CCTT at any time," what are you referring to?

7    A.    That they have access to the CCTT bank account, and they

8    can withdraw their portion of the funds at their leisure.

9    Q.    Why were they entitled to withdraw funds?

10   A.    They were signatures on the bank account.

11   Q.    Why were they entitled on any home transaction to withdraw

12   from the CCTT bank account?

13   A.    They were part of the CCTT Group, and we were partners in

14   the sale of the homes, therefore a partner in proceeds.

15   Q.    When you instructed them that they could take withdrawals

16   from the CCTT bank account, did you ever have any issues about

17   one person in your group would take more than they were

18   entitled to?

19   A.    No.

20   Q.    To what extent did you trust Mr. Castle?

21   A.    I trusted him to withdraw the funds that were his portion

22   and only his portion.

23   Q.    All right.  Let's pull up, please, Exhibit 105.

24         This is another reconveyance?

25   A.    Yes, it is.

1    Q.    Do you recognize it to be part of your program?

2    A.    Yes, I do.

3    Q.    Did you know who Jennifer Pezzi was?

4    A.    I believe she was related to Laura Pezzi who was part of

5    this process.

6    Q.    Okay.  And "part of this process" meaning what

7    specifically?

8    A.    Part of the mortgage relief process.  I believe Laura

9    Pezzi worked for George Larsen and Al Kirkpatrick.  I believe

10   Laura Pezzi was her daughter or Jennifer was Laura Pezzi's

11   daughter.

12   Q.    Was she a Wells Fargo home mortgage authorized

13   representative?

14   A.    No.

15   Q.    On this property, Brenda Douglass's property, you had no

16   personal involvement in the filing of this deed of

17   reconveyance?

18   A.    I don't believe so.

19   Q.    It shows up here it's in El Dorado County, which is

20   somewhat local to us here.  Did you ever travel to El Dorado

21   County to file a deed of reconveyance?

22   A.    No.  I did not.

23   Q.    At any point were you surprised to learn that these deeds

24   of reconveyances were being filed on any properties?

25   A.    No.  It was part of the process.

1    Q.   What was your intention as far as whether these documents

2    should be filed on all of the properties in your program?

3    A.   I'm not sure I understand what you're asking me.

4    Q.   Did you know these documents were being created and

5    filed?

6    A.   Yes.

7    Q.   Did Mr. Castle know these documents were being created and

8    filed?

9    A.   Yes.

10   Q.   Did you intend to have other people file them as part of

11   the process?

12   A.   Yes.

13   Q.   Did he intend to have other people file them as part of

14   the process?

15            MR. ORTIZ:   Objection.  Calls for speculation.

16            THE COURT:   Sustained.

17   BY MS. HEMESATH:

18   Q.   Did you have conversations with Mr. Castle about the

19   filing of these documents as part of the process?

20   A.   Yes.

21   Q.   Based on those conversations, did you gain an

22   understanding of his awareness that these documents would be

23   filed?

24   A.   Yes.

25   Q.   Based on those conversations, did you gain an awareness of

1    whether he intended for these documents to be filed as part of

2    the process?

3    A.   Yes.

4    Q.   And is that true for every step involved in getting these

5    documents on file?  So beginning with the creation of these

6    documents from the Word templates that you described, did

7    Chris Castle know that was happening?

8              MR. ORTIZ:  Objection.  Calls for speculation.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yes.  The first properties that were

11   sold had these on there before I was even involved.  They were

12   filed by Chris.

13   BY MS. HEMESATH:

14   Q.   How about getting somebody to sign on these documents, did

15   Mr. Castle know that people who were not authorized

16   representatives were going to be signing on these documents?

17   A.   Yes.  It was part of the process.

18   Q.   And did he know that these documents would then be taken

19   to be recorded at the county recorder's offices to be part of

20   the title for these properties?

21   A.   Yes.

22   Q.   And did he intend for that happen?

23   A.   Yes.

24             MR. ORTIZ:  Objection.  Calls for speculation.  Move

25   to strike her response.

24

1        THE COURT:  Overruled.  Denied.

2   BY MS. HEMESATH:

3   Q.   I think you've said earlier in your testimony, and correct

4   me if you haven't, but if part of the purpose of this program

5   was to help homeowners who were in some kind of distress, why

6   not just file these documents on title and then leave it at

7   that?

8   A.   That would have -- yes, that could have been done.  It

9   would have solved the same -- it would have led to the same

10  outcome if you just filed the reconveyance.

11  Q.   Would that have affected your ability to sell the property

12  if you just recorded these documents and did nothing else?

13  A.   I don't believe so.

14  Q.   Why were you then taking the additional step of actually

15  selling these properties?

16  A.   To get the proceeds.

17  Q.   We showed you a lot of properties last Wednesday.  In your

18  experience across the entire program, all the dozens of houses

19  that you said came into the program, were the banks ever paid

20  for the mortgage debt that was owed to them?

21  A.   No.

22  Q.   Approximately how long was the mortgage program going

23  on?

24  A.   I believe about a year and a half.

25  Q.   At the high point in the program, about how many

1    properties would you have had going at once?

2    A.    In any given time, there were probably three dozen, four

3    dozen somewhere in the pipeline.

4    Q.    And at that high point, are you fairly busy?

5    A.    Me personally, not really, no.

6    Q.    Okay.  Why is that?

7    A.    There wasn't a lot involved in this.  It sounds very

8    complicated.  But there was a small amount of paperwork, and it

9    was not time consuming.  It just took a lot of waiting.  You

10   sent a document.  You would wait.  You sent a document.  You

11   wait.  It didn't get busy until right as the property was going

12   to close escrow.

13   Q.    Okay.  At that high point in the program when you had you

14   said dozens of properties going at once, what was Mr. Castle's

15   role at that point?

16   A.    Same as it always was.  He was the director of it.

17   Q.    Let's look at Government's Exhibit 51.  This is another

18   email?

19   A.    Yes.

20   Q.    Do you see yourself and Castle in there?

21   A.    Yes.

22   Q.    And who is it actually from?

23   A.    Chris Castle.

24   Q.    All right.  We can go back out to the substance of the

25   email.  I want to bring us down here into that part in

1  particular.  You can start reading for us there where it says

2  "While all"?

3  A.  (Reading) "While all the franchisees have been doing a

4  great job, I would like to specifically acknowledge all

5  associated with Al Kirkpatrick Group for their efficiency,

6  attention to detail, and professionalism.  As we are all aware,

7  this is a complicated process, and they have shown tremendous

8  proficiency in their abilities.  Keep it up!"

9  Q.  What did it mean for you financially when the franchisees

10 were doing -- were doing well?

11 A.  We were making more money.

12 Q.  And you recognized that at that time?

13 A.  Yes.

14 Q.  Did Mr. Castle recognize that at that time, if you knew?

15 A.  He was also making more money, yes.

16 Q.  How much in total do you estimate you made from this

17 program?

18 A.  Me personally?  Approximately 700,000 to 800,000.

19 Q.  And that's over that 18-month period of time you

20 indicated?

21 A.  Yes.

22 Q.  Do you know approximately what Mr. Castle's share was?

23 A.  It would have been the same as mine.

24 Q.  I want to turn back to the contracts that you had the

25 homeowners sign, and if we can pull up 823 as an example.  Why

1   did you need a contract with the homeowners?

2   A.   In reality, we probably didn't, in order to complete the

3   process, but again, it was part of the process to outline who

4   was involved and how much money each party would receive.

5   Q.   Whose idea was it to have a contract with the

6   homeowners?

7   A.   I believe it was Chris's.

8   Q.   This second paragraph there, would you read for us what

9   CCTT's role was according to this contract?

10  A.   "CCTT Group agrees to bring their professional knowledge

11  and expertise in the area of mortgage foreclosure relief,

12  mortgage fraud relief, real estate, title, escrow, and any

13  other information that may present a benefit to the business

14  relationship."

15  Q.   All right.  We can go back out.  Thank you.

16       And then read us just that very short paragraph there

17  about compensation.

18  A.   "The compensation specifically includes: proceeds from the

19  sale of the candidate property.  Proceeds shall be paid to the

20  parties directly from escrow."

21  Q.   And this was signed right at the beginning of when the

22  homeowner enrolled in the program?

23  A.   Yes.

24  Q.   And let's turn to that signature page on the last page of

25  that.  Okay.  On this one, who is signing?

1    A.    Chris Castle and myself sign on behalf of CCTT Group.

2    David Thompson and Melissa Thompson are the clients.

3    Q.    And if you look at Mr. Castle's signature there, is that a

4    wet ink signature by him, or is that the stamp you were talking

5    about last week?

6    A.    I believe that to be the stamp.

7    Q.    Okay.  And who stamped it again?

8    A.    I would have.

9    Q.    Why did he need to be on this contract at all and not just

10   you?

11   A.    I don't know.

12   Q.    Why did you include a signature block for him?

13   A.    I believe that's just the way the draft or the template of

14   the document was sent to me from Chris.

15   Q.    I'm going to have you look in that folder.  I'm going to

16   move to admit two more documents, the folder in front of you at

17   the exhibits that are marked 1023 and 1022.  Just tell us if

18   you recognize those.

19   A.    1023 is a standard contract from CCTT Group to

20   Michael Romano and Carol Lytle.

21   Q.    Did I include 1021 in there as well?

22   A.    Yes, you did.

23   Q.    Okay.  What is that one, just a very brief description?

24   A.    This is also an agreement and disclaimer.

25   Q.    And then how about 1022?

1    A.    Nondisclosure and Confidentiality Agreement.

2    Q.    Do you recognize those documents?

3    A.    Yes, I do.

4    Q.    How do you recognize them?

5    A.    These were the three documents that were sent to each

6    homeowner as part of the process.

7              MS. HEMESATH:  Move to admit 1021, 1022 and 1023.

8              MR. ORTIZ:  No objection your, Honor.

9              THE COURT:  Admitted.

10             (Government's Exhibits 1021, 1022 and 1023 were

11   admitted into evidence.)

12   BY MS. HEMESATH:

13   Q.    All right.  Let's start with 1023, please, page 3.  So in

14   the signature portion here, who is Michael Romano?

15   A.    Michael Romano worked with Al Kirkpatrick to bring

16   homeowners in to the process.

17   Q.    Okay.  And then Carol Lytle is the homeowner?

18   A.    Yes.

19   Q.    Was it significant to you that there is no Chris Castle

20   stamp on this one?

21   A.    Not necessarily.

22   Q.    Did that affect at all the way the house moved through the

23   program?

24   A.    No.  It did not.

25   Q.    Let's look at 1022, please.  What was this document?

1    A.    A nondisclosure agreement.

2    Q.    What does a "nondisclosure agreement" mean?

3    A.    It is something for, in this case, Carol Lytle to

4    acknowledge that she will not discuss this process with anyone

5    else.

6    Q.    That's that -- it's in bold and underlined there, can you

7    read that for us.

8    A.    "I expressly agree not to talk about any aspect of what

9    the Pillow Foundation or any of its agents (including myself)

10   are doing regarding the above property."

11   Q.    And then why don't you go ahead and keep going.

12   A.    "I expressly agree that every aspect of what we (myself

13   and Pillow Foundation) are doing is to be kept strictly

14   confidential."

15   Q.    Why was that necessary?

16   A.    I believe Mr. Castle did not wish other people to steal

17   his process and go out and use it on their own.

18   Q.    Who drafted the language in this nondisclosure

19   agreement?

20   A.    I do not know.

21   Q.    It wasn't you?

22   A.    It was not.

23   Q.    Okay.  Was it part of the documents that the homeowners

24   signed to become part of this program?

25   A.    Yes, it was.

1  Q.  And did you maintain it as part of those documents?

2  A.  I maintained copies, yes.

3  Q.  The secretiveness, based on your conversations with

4  Chris Castle, would he have been aware that there were

5  nondisclosure agreements that homeowners were required to

6  sign?

7  A.  Yes.  He would have given me this document.

8  Q.  All right.  We can go ahead and take that down.

9      You said the program lasted approximately 18 months?

10  A.  To the best of my recollection.

11  Q.  Approximately when did it come to a conclusion?

12  A.  Late in 2011.

13  Q.  Why did it end?

14  A.  A couple of reasons.  Title and escrow had flagged a lot

15  of the participants in this process, and we were having

16  difficulty getting properties through.  Chris Castle had also

17  fled the country at that time.  We had a number of lawsuits

18  pending against us as well.

19  Q.  All right.  Let's talk about the problems that the title

20  and escrow companies you mentioned and the lawsuits you just

21  mentioned.  Was Chris Castle aware of these problems?

22  A.  Yes, he was.

23  Q.  How do you know he was aware?

24  A.  He was the one that engaged the attorneys.

25  Q.  And then I think you said in the middle there that he

1    fled.  Why don't you describe what you mean by that.

2    A.   Originally he had told me that he was going on vacation

3    with his family and that they would be gone for a little while.

4    After a couple of weeks, I began asking when he would return,

5    and at some point in time he finally admitted that, no, he was

6    not going to be returning to the United States.  He had moved

7    to New Zealand.

8    Q.   From your conversations with him, did you have any

9    understanding of whether that move to New Zealand had anything

10   to do with the end of this mortgage program?

11              MR. ORTIZ:  Objection.  Calls for speculation.

12              THE COURT:  Overruled.

13              THE WITNESS:  No.  I did not have any specific

14   conversations with him regarding that.

15   BY MS. HEMESATH:

16   Q.   Did you have any sense, based on your conversations with

17   him while he was oversees, about whether he was planning to

18   come back?

19   A.   He had indicated that he was not planning on returning and

20   had moved his household goods to New Zealand.

21   Q.   Based on your conversations with him, did you have a sense

22   of whether that move was a coincidence?

23              MR. ORTIZ:  Objection.  Calls for speculation.

24   Relevance.

25              THE COURT:  Overruled.

1    THE WITNESS:  I don't believe it was a coincidence,

2    no.

3    BY MS. HEMESATH:

4    Q.   And why don't you believe that?

5    A.   If there were no issues, why did he have to leave?

6    Q.   While he was oversees, were you communicating with him

7    about the problems that you were having with the mortgage

8    program?

9    A.   Yes.

10   Q.   And was he responding?

11   A.   To some extent, yes.

12   Q.   Did any of those solutions he proposed help in any way?

13   A.   No.

14        MS. HEMESATH:  Nothing further, thank you.

15        THE COURT:  Cross.

16        MR. ORTIZ:  Yes.  Thank you.

17                     CROSS-EXAMINATION

18   BY MR. ORTIZ:

19   Q.   Ms. Trites, good morning.

20   A.   Good morning.

21   Q.   I think you indicated last week that you were testifying

22   in this proceeding with the hope of benefiting yourself at your

23   sentencing?

24   A.   Correct.

25   Q.   And you are giving testimony.  Who decides whether or not

1    you get a favorable recommendation?

2    A.    I believe the judge.

3    Q.    The government, right?

4    A.    Yes.

5    Q.    So the person who was just asking you all of these

6    questions decides whether to recommend favorably on your behalf

7    at your sentencing hearing next month; is that true?

8    A.    Yes.

9    Q.    As far as the process itself, Mr. Castle shared with you

10   various things that he had learned over the course of time

11   about bank fraud; is that a correct statement?

12   A.    Yes.

13   Q.    And he explained to you about the UCC like you described

14   last Wednesday and some discrepancies in mortgage documents

15   that kind of led to this whole thing?

16   A.    Yes.

17   Q.    The process itself, he told you essentially what?

18   A.    I'm not sure I understand what you're asking.

19   Q.    Sure.  You indicated earlier that the point of this

20   process was to help distressed homeowners, correct?

21   A.    Yes.  That and make money.

22   Q.    No, I understand.  That's what you said last week.  But as

23   far as what Chris told you, the point of this process was to

24   help distressed homeowners, right?

25   A.    It was to help distressed homeowners and to make money.

1    Q.    You've testified to this once before?

2    A.    Yes.

3    Q.    And in that proceeding, you were asked the exact same

4    question; do you remember that?

5    A.    Not specifically.

6    Q.    You were asked what the purpose of the process was; do you

7    remember that?

8    A.    Again, I remember testifying.  I don't remember the

9    specific question.  If you could show me the testimony?

10   Q.    Sure.

11         May I approach, your Honor.

12             THE COURT:  Yes.

13   BY MR. ORTIZ:

14   Q.    Ms. Trites, if you can read to yourself lines 5 through 9,

15   please.  So when you testified last time, you were asked

16   specifically how did Mr. Castle explain this program to you,

17   and he told you that it was to help distressed homeowners;

18   isn't that right?

19   A.    Yes.

20   Q.    You made no mention that his goal was to make money, did

21   you?

22   A.    I don't believe that question was specifically asked, but

23   that was part of the process.

24   Q.    But you didn't testify to that the last time, did you?

25   A.    I may not have specifically in that answer.  If I did, I

1    apologize for that being incomplete.

2    Q.   And what did he tell you as far as how it was that this

3    process would be able to help distressed homeowners?

4    A.   Are you -- again, I'm a little confused by what you're

5    asking.  Are you asking me if the sale of the home would

6    provide proceeds to --

7    Q.   Well, what is the process?

8    A.   The process is to remove the current loans from the home

9    and sell the property.

10   Q.   And did he explain to you why that could happen?

11   A.   Again, I'm not sure what you're asking me, why it could

12   happen?  Why the house could sell?

13   Q.   Why -- well, let me ask it this way.  You mentioned that

14   there was an issue regarding the separating the note with the

15   deed.  Do you remember talking about that last week?

16   A.   Yes.

17   Q.   And what does that mean?

18   A.   Part of the way through the process we began doing

19   securitization audits, and that was to show that the note and

20   deed were separated in the securitization of those documents.

21   Q.   What is that audit?  What would it show?

22   A.   Basically it would show that -- where a note was

23   transferred, the deed of trust may not have also been

24   transferred.

25   Q.   Can we pull up Government's 50, please.

1    Ms. Trites, do you see up on the screen what's been marked

2    as Government's Trial Exhibit 50?

3    A.    Yes.

4    Q.    And this is an email that is entitled, at least in part,

5    "Securitization Audit"?

6    A.    I'm sorry.  My screen went blank.

7              THE COURT:  Is it still blank?

8              THE WITNESS:  Oh, there, it's back.

9              THE CLERK:  It has not been admitted, your Honor.

10   BY MR. ORTIZ:

11   Q.    Let me ask you this.  How did Chris explain to you what

12   that audit was?  What was the point of it?

13             MS. HEMESATH:  Objection.  Hearsay.

14             THE COURT:  Overruled.

15             THE WITNESS:  The point was to show the note and deed

16   were separated.

17   BY MR. ORTIZ:

18   Q.    It would show that the banks were committing fraud,

19   right?

20   A.    I don't know that.

21   Q.    Didn't he tell you that?

22   A.    He may have.  I don't specifically recall that.

23   Q.    And whatever it is that he told you regarding this

24   process, you believed it to be a legitimate process, right?

25   A.    I believed the information coming from the securitization

1  audits was accurate and correct.

2  Q.   And you believed that whatever you got from those audits

3  allowed you to take the action that you took during the course

4  of this process, true?

5  A.   No.  The securitization audits had nothing to do with the

6  sale of the house.

7  Q.   What about the filing of documents, recording of

8  documents?

9  A.   The recording documents, the deed of trust, the

10  reconveyance, or the rescission of notice of default were

11  essential to removing any current mortgage or foreclosure

12  action to the property.

13  Q.   Right.  And you believed that as you did that, as you

14  helped in that, that it was a legitimate thing to do, right?

15  A.   I believed at no time did we have authorization from the

16  banks to file those documents but that it was an integral part

17  of the process to do it.

18  Q.   But you thought it was legal to do it, didn't you?

19         MS. HEMESATH:  Objection.  Relevance.

20         THE COURT:  Overruled.

21         THE WITNESS:  Again, it was -- at no time did we have

22  authority from the banks or anybody else to sign those

23  documents.

24  BY MR. ORTIZ:

25  Q.   I understand that.  And by the end, this program came to

1   an end eventually, right?

2   A.   Yes, it did.

3   Q.   But as you began this process, when you joined CCTT and

4   Chris explained to you what the process was and his rationale

5   behind it, you believed him, right?

6   A.   I did.  I wanted to.

7   Q.   And when you created these template deeds of trust to give

8   to the franchisees, as you called them, you believed that's

9   something that you were authorized to do, right?

10  A.   No, I didn't.  Those documents were never legal or

11  authorized by anyone.  Everybody knew that.

12  Q.   When was that conversation?

13  A.   From the very beginning.  Everyone knew that there was no

14  authority granted to us.

15  Q.   You were asked about this very specific issue the last

16  time you testified, right?

17  A.   Again, possibly I remember testifying.  I don't remember

18  every specific question.

19  Q.   Do you remember being asked, based on information that

20  Chris put out and his explanation as to what he was doing was

21  legal and legitimate, you believed that you were authorized to

22  do what you were doing, right?

23  A.   That's what Chris told us.

24  Q.   So at the time based on your experience and his

25  explanation, it sounded reasonable to you, right?

1    A.    Again, I wanted to believe it, but at no time did any bank

2    give us that authorization.

3    Q.    And it sounded legal, right?

4    A.    Yes.  His mumbo jumbo sounded legal.

5    Q.    And you believed, based on what he told you, that you were

6    authorized to do what you did?

7    A.    I wanted to believe it, but at no time did any bank give

8    us any authority to sign any of those documents on their

9    behalf.

10   Q.    But you did it anyway?

11   A.    I did it anyway.

12   Q.    And as far as the documents that you're talking about, you

13   prepared most of those, right?

14   A.    I prepared a lot of things, yes.

15   Q.    You prepared all of the documents that were recorded,

16   right?  You created the templates for all of those documents,

17   didn't you?

18   A.    Again I did not create all the documents.  I created

19   several templates, yes.

20   Q.    What templates did you create?

21   A.    Throughout the process I think I turned just about

22   everything into a template to automate the process.

23   Q.    And that would include the deeds of trust, right?

24   A.    Yes.

25   Q.    That would include the deeds of reconveyance, right?

1  A.   Again, yes, templates were created.

2  Q.   And you're the one who sent those out for signature,

3  right?

4  A.   I did not send all of those documents out.  The templates

5  were available for anyone to use.

6  Q.   But as far as the templates that you created, you sent

7  them out, didn't you?

8  A.   I guess I don't know what you mean by I sent them all out.

9  They were uploaded to a repository where everyone had access to

10 them.

11 Q.   You emailed them to the franchisees?

12 A.   In some cases, yes.

13 Q.   In most cases, right?

14 A.   Possibly.

15 Q.   There was also some letters that were part of this

16 process, right?

17 A.   Could you be more specific, please.

18 Q.   Sure.  There were letters that you prepared and you sent

19 to John DiChiara for signature, and those were to be mailed to

20 the banks; does that sound familiar to you?

21 A.   Yes.  Those were documents that Chris created with another

22 gentleman.  He gave them to me.  I would insert the homeowners'

23 information, the property information, and then the documents

24 were sent or presented to John DiChiara for signature.  At the

25 beginning of the process, John created those documents with his

1   assistant, Joshua Smith.

2   Q.   Okay.  When were you given these documents, this was

3   before you even started actually doing the process, right?

4   A.   At the very beginning, Chris showed us some letters.  He

5   took them back.  I did not see them or have access to them for

6   several months into the process.  He kept that information very

7   secret, and only he and John DiChiara had access to them for

8   quite a while.

9   Q.   But when you did get them, you're the one who pulled the

10  bank information, right?  You found the bank information, put

11  those in those letters, true?

12  A.   No.  The bank information was ordered from a CUSIP report

13  by a friend or associate that Chris knew, and we paid him to

14  provide that information.

15  Q.   Do you recall testifying that you pulled a form of title

16  report and you used that information to get the lender

17  information to put into those letters?  Do you remember saying

18  that the last time you testified?

19  A.   No.  But I do recall pulling title reports for

20  properties.

21  Q.   Do you recall saying specifically:  (Reading) "I did not

22  have access to the system.  It wasn't a full title report, but

23  it would give me the information on who was the lender of

24  record."?

25       And then the question was:  "Okay.  And then you would

1    forward those to the franchisees?"

2        And your answer was:  "I would use that information to put

3    in the three letters that were sent out that John DiChiara

4    signed."

5        Do you remember testifying to that the last time?

6    A.   Yes.

7    Q.   That was accurate, right?  That's what you did?

8    A.   Yes, several months into the process.  But for several

9    months I did not do that, and those letters were done by Chris,

10   John, and Joshua Smith.  I was not given access to them.

11   Q.   Well, if you had no access to them, how do you know that

12   Chris sent them?

13   A.   Chris said he did.  John said he did.

14   Q.   Do you have any copies of any of those letters?

15   A.   No.  I don't believe they gave me copies.

16   Q.   I thought you kept copies of everything?

17   A.   Everything that I had access to.  In the beginning Chris

18   was very secretive.  He did not give anybody copies of those

19   documents.

20   Q.   You also created the spreadsheets that showed the

21   breakdown of where the monies were going once a property sold,

22   true?

23   A.   True.

24   Q.   You prepared all of those, right?

25   A.   I did not prepare all of them.  I certainly prepared most

1   of them.  They were then given to all the parties involved for

2   approval before any funds were disbursed.

3   Q.  As far as those spreadsheets, it was either you or the

4   specific franchisees who prepared those spreadsheets; does that

5   sound right?

6   A.  More than likely, yes.

7   Q.  Can we pull up 60, please.

8           MS. HEMESATH:  It's not in evidence.

9           MR. ORTIZ:  How about 100?

10          MS. HEMESATH:  100A?

11          MR. ORTIZ:  Let's do 101, please.

12          MS. HEMESATH:  Mr. Ortiz, it looks like we're hung up

13   on our computer.  Do you want the paper exhibit?

14          MR. ORTIZ:  I have it.

15  Q.  Ms. Trites, do you see up on the screen what's been marked

16  as Government's Exhibit 101?

17  A.  Yes.

18  Q.  And this is a sample of a deed of trust that was recorded

19  with the county recorder's office, right?

20  A.  Yes.

21  Q.  And is this an example of the template or a template that

22  you created for use by other individuals?

23  A.  Yes.

24  Q.  Golden Hills Trust, that does not relate to Chris, does

25  it?

1   A.   No.  It does not.

2   Q.   Do you know who prepared this document?

3   A.   I may have completed it for Al Kirkpatrick.  He may have

4   done it or Laura Pezzi possibly.

5   Q.   Can we go to 104, please.

6        Ms. Trites, do you see what's been marked as Government's

7   104 on the screen?

8   A.   Yes.

9   Q.   And again this is a sample of a document that you would

10   have created in a template?

11   A.   Yes.

12   Q.   Did you fill out this information on this document?

13   A.   Again, it's possible.  I don't recall specifically.  It

14   could have been again myself.  I'm not sure who Brenda Douglass

15   was working for, but they could have filled in the specific

16   names.

17   Q.   And you don't see Chris's name on here, do you?

18   A.   No.  I do not.

19   Q.   Can we go to 105, please.

20        Up on the screen now is 105.  Do you see that, ma'am?

21   A.   Yes.

22   Q.   And did you create this document?

23   A.   Again, it's entirely possible.  I don't recall them

24   specifically.

25   Q.   Did you see Chris's name on here anywhere?

1    A.   No.  I do not.

2    Q.   If we can go to 106, please.

3         And again, this is another document, a Notice of

4    Rescission of Notice of Default.  Do you see that?

5    A.   Yes.

6    Q.   And this is a sample of a document that you would have

7    prepared?

8    A.   Yes.

9    Q.   Do you know who executed this document?

10   A.   It's signed by Daniel Young.

11   Q.   You don't know who that is?

12   A.   No.  I do not.

13   Q.   You don't see Chris's name on there, do you?

14   A.   No.  I do not.

15   Q.   Can we go to 120, please.

16        THE CLERK:  120 is not admitted.

17        MR. ORTIZ:  Okay.

18   Q.   The Shon-te-East church, that was John's church, right?

19   A.   Yes.

20   Q.   And John was a partner in the association of CCTT,

21   right?

22   A.   Yes.

23   Q.   Do you know when John even formed that church?

24   A.   I do not.

25   Q.   Can we go to Exhibit 801, please.

1      Do you see up on the screen, Ms. Trites, Exhibit 801?

2  A.   Yes.

3  Q.   And this is another sample of a document that you would

4  have prepared, right?

5  A.   Yes.

6  Q.   And you might have done this one as well, correct?

7  A.   Correct.

8  Q.   And the address here is CCTT Group, but it has a San Diego

9  address, right?

10  A.   Yes.

11  Q.   Was Chris living down in San Diego at this time?

12  A.   Not to my knowledge.

13  Q.   804, please.

14      Do you see 804 on the screen?  It's called a Substitution

15  of Trustee and Deed of Reconveyance.

16  A.   Yes.

17  Q.   Again, document you would have prepared?

18  A.   Yes.

19  Q.   Chris's name is not on there?

20  A.   No.

21  Q.   805, please.

22      Up on the screen now, Ms. Trites, is another substitution

23  of trustee and deed of reconveyance.  Do you see that?

24  A.   Yes.

25  Q.   Again, a document you would have prepared?

1    A.   Yes.

2    Q.   And no name -- Chris's name is not on there?

3    A.   No.

4    Q.   823, this is a sample of the contract that you talked

5    about earlier?

6    A.   Yes.

7    Q.   And do you know when this form contract was prepared?

8    A.   I don't know when Chris created the template.  This

9    specific one has a date at the top of October 6, 2010, so

10   approximately that time.

11   Q.   And you went over this earlier with Ms. Hemesath, but at

12   paragraph two of this document, it describes what CCTT will be

13   providing into this process, right?

14   A.   Yes.

15   Q.   And CCTT is providing its knowledge and its expertise?

16   A.   Correct.

17   Q.   There was a separate document, though, between the

18   homeowner and what you call a franchisee, right?

19   A.   I don't specifically remember.  There may have been.

20   Q.   And in that contract, it describes everything that the

21   franchisee, using your term, is going to do throughout this

22   process, right?

23   A.   I'm having a hard time recalling that document.  Can you

24   show me.

25   Q.   Sure.

1    A.    In a sample.

2              MR. ORTIZ:  I'm not sure if it's admitted, but can I

3    approach, your Honor?

4              THE COURT:  Yes.

5              THE WITNESS:  Oh, yes.

6    BY MR. ORTIZ:

7    Q.    Do you recognize this?

8    A.    Yes, I do.

9    Q.    Do you want to look at both pages?

10   A.    Yes.  Now that you showed it to me, I understand what

11   you're referring to.

12   Q.    All right.  Up on the screen now is 822; do you see

13   this?

14   A.    Yes.

15   Q.    And it identifies that this is an agreement between you

16   and the Thompsons, right?

17   A.    Well, not me specifically but CCTT, I believe, is on the

18   signature page.

19   Q.    Can we go to page 2.  Where?

20   A.    Oh, my apologies.  It just has my signature.

21   Q.    So this is between you individually and the Thompsons,

22   right?

23   A.    Correct.

24   Q.    And in this agreement you were letting the Thompsons know

25   what you're going to be doing during this process, right?

1    A.    Yes.

2    Q.    If we go back to page 1, the very first thing you're going

3    to be doing is providing all documents required to complete the

4    mortgage administrative judgment process; is that right?

5    A.    Correct.

6    Q.    And what documents does that include?

7    A.    That includes all of the documents from CCTT and the

8    documents from Shon-te-East-a.

9    Q.    That includes the letters, right?

10   A.    Can you --

11   Q.    The three letters that John DiChiara would send out?

12   A.    I did not provide those to the homeowner, no.  They were

13   part of the process, yes.

14   Q.    Right.  And you're telling the homeowner in this agreement

15   that you're going to be doing it, right?

16   A.    Yes.

17   Q.    And the various -- and I'll go through the documents

18   individually.  The three letters that you put the banking

19   information in and gave to John DiChiara to mail out to the

20   banks, that's part of the process, right?

21   A.    Correct.  But specifically I couldn't tell you if this was

22   early in the process where they were doing the letters or if it

23   was later in the process where I was doing the letters.

24   Q.    Okay.  The deeds of trust that you described had the fake

25   lenders on them?

1    A.    Uh-huh.

2    Q.    That was your responsibility, according to this contract,

3    to do, right?

4    A.    For this specific property, yes.

5    Q.    You as an individual, not CCTT, right?

6    A.    Me in my capacity with CCTT bringing this homeowner into

7    the process, yes.

8    Q.    But this agreement doesn't say that, does it?

9    A.    No, it doesn't.

10   Q.    It's just you as an individual person and the Thompsons as

11   individual people, right?

12   A.    Yes.

13   Q.    It says that you were going to provide the client with the

14   complete set of all documents, right?

15   A.    Yes.

16   Q.    And that any real estate services, like agents, would not

17   be part of the process in relation to sale of the home?

18   A.    Correct.

19   Q.    But on several of these properties, Ms. Trites, you acted

20   as the broker, right?

21   A.    Yes, I did.

22   Q.    How many?

23   A.    I don't recall specifically.

24   Q.    And then there was a disclaimer section in this agreement

25   between you and the homeowners, right?

1   A.   Yes.  That was a standard document for this process.

2   Q.   And then it lays out a bunch of things that you as an

3   individual want the homeowner to know, right?

4   A.   Yes.

5   Q.   And then now we go back to the 823, which is the contract

6   between CCTT and the homeowner, it has different language in

7   that one, doesn't it?

8   A.   Yes.

9   Q.   It does say that CCTT will be compensated for their

10  professional knowledge, right?

11  A.   Yes.

12  Q.   But it also tells the homeowner that CCTT is not an

13  attorney, correct?  If you look at the very bottom of page 1.

14  A.   Yes.

15  Q.   Do you see that?

16  A.   Yes.

17  Q.   And then if we go to the top of page 2, and then the

18  contract says that the information provided by CCTT to the

19  homeowner is for educational purposes only; do you see that?

20  A.   Yes.

21  Q.   And that language is in every one of the contracts between

22  CCTT and the homeowner, right?

23  A.   I believe so.

24  Q.   These contracts, unlike the agreement that you did with

25  the Thompsons, the CCTT contract doesn't say that it's going to

1  record documents, does it?

2  A.   I don't believe it specifically says it will record

3  documents.

4  Q.   It's not going to send out letters.  It doesn't say that,

5  does it?

6  A.   No.  But all three of these documents were created by

7  Chris Castle and given to me as part of this process.

8  Q.   No.  I understand.  You said that already.  These

9  documents were given to you and that you sent them out to

10  whoever you sent them out to, correct?

11  A.   Correct.

12  Q.   How did it come to be on this specific property,

13  Ms. Trites, that you acted as a franchisee, for lack of a

14  better word?

15  A.   I knew the Thompsons.

16  Q.   They were friends of yours?

17  A.   Specifically, they were friends of an agent of mine, but

18  yes, I knew them.

19  Q.   So going back to a question I asked you earlier about your

20  belief as to the legality of this process, you believed it

21  enough, at least in October of 2010, to do this on behalf of a

22  friend of yours, true?

23  A.   I did do this on behalf of the Thompsons, yes.

24  Q.   And in some of the properties your husband participated in

25  this, correct?

1    A.    Correct.

2    Q.    And some of these properties friends of your family

3    participated in it, right?

4    A.    Correct.

5    Q.    And that's true for 2010 and 2011, right?

6    A.    Yes.

7    Q.    When was the last time, if you can remember, that you did

8    this process with someone in your family or a friend of

9    yours?

10   A.    I don't recall dates.

11   Q.    Can we go to 900, 901, please.  It would actually be page

12   3 of 901.

13         Ms. Trites, do you see up on the screen what's been marked

14   as Government's Trial Exhibit 901, page 3?

15   A.    I see page 1.  I believe that's page 1.  Oh, I'm sorry,

16   yes, page 3.

17   Q.    And this is a deed of trust that has a return address for

18   Golden Hills Trust?

19   A.    Yes.

20   Q.    A document you would have prepared?

21   A.    I'm sure I prepared the template.  I don't know if I

22   specifically prepared this one.  It doesn't look like my

23   handwriting at the top.  This was a property belonging to

24   Al Kirkpatrick.

25   Q.    903, page 2, do you see that --

1    A.    Yes.

2    Q.    -- Ms. Trites?

3          Again, this is a document that you would have prepared?

4    A.    It's possible.  This specific document does not look

5    familiar to me at all.  A corporate deed of release is not a

6    document I'm specifically familiar with.

7    Q.    If you could go to 101.

8          Do you see this, Ms. Trites, Exhibit 101?

9    A.    Yes.

10   Q.    And this is another deed of trust with Golden Hills

11   Trust?

12   A.    Correct.

13   Q.    As the return addressee?

14   A.    Yes.

15   Q.    It's another document you would have prepared?

16   A.    Again, it's possible I prepared the template.  The return

17   address is to Al Kirkpatrick.

18   Q.    Do you know who prepared this document?

19   A.    I may have filled it out.  It could have been Laura Pezzi.

20   It could have been Al.

21   Q.    Chris's name is not on there anywhere, is it?

22   A.    Not on this page, no.

23   Q.    10 -- or 1003, please.

24          We saw one of these earlier.  Up on the screen now is

25   what's called a Notice of Rescission of Notice of Default.  Do

1   you see that, ma'am?

2   A.   Yes.

3   Q.   And first do you recognize this specific document?

4   A.   Yes.

5   Q.   And this is a document that you would have prepared,

6   correct?

7   A.   Again, quite possibly, yes.

8   Q.   Chris's name is not on there, is it?

9   A.   No.  It is not.

10  Q.   There are some documents that you saw on Wednesday that

11  appeared to have his name on it though, right?

12  A.   Yes.

13  Q.   How many in total would you say had his name on it?

14  A.   I'm sorry.  I don't know.  I saw a lot of documents on

15  Wednesday.

16  Q.   Can we have 1004, please.

17       Up on the screen now is Government's Exhibit 1004.  It's a

18  Substitution of Trustee and Deed of Reconveyance; do you see

19  that?

20  A.   Yes.

21  Q.   And that's a document that you would have prepared?

22  A.   Again, possibly, yes.

23  Q.   And that would be true for all the properties that went

24  through the program, right, that you would have prepared these

25  various templates?

1   A.   I probably created the templates.  I don't know

2   specifically which ones I did fill out or didn't.  There were a

3   lot.

4   Q.   The templates you prepared and then as to specific

5   properties, sometimes you filled the information in, sometimes

6   what you called the franchisees filled in the information,

7   correct?

8   A.   Correct.

9   Q.   As far as the letters that we talked about earlier, how

10   did that letter process work?

11   A.   The letters that Chris created that were sent to the

12   banks?

13   Q.   Yes.

14   A.   How did the process work?

15   Q.   Yes.

16   A.   There were three letters.  They were sent to the banks via

17   certified mail 30 days apart.

18   Q.   And do you know what was in those letters?

19   A.   If you showed me one, I would probably remember, but any

20   specific language, it's been way too many years since I've read

21   one.

22   Q.   And why were there three?

23   A.   I don't know.  That was just the process that Chris gave

24   us.

25   Q.   And as far as the process that Chris shared with

1    everybody, he told you that the effect of these letters was to

2    allow the recording of these various documents, true?

3    A.   I don't recall that he specifically said that.

4    Q.   What do you recall him saying about the letters and the

5    need for them?

6    A.   To give notice to the banks.

7    Q.   Notice of what?

8    A.   I'm not sure I specifically remember.  I was just -- we

9    were notifying the banks.

10   Q.   Of what?

11   A.   Of, I guess, the information in the letters.

12   Q.   Right.  But as far as specifics as to what you were

13   telling the banks in these letters.

14   A.   I don't recall specifically.  I'm sorry.  This was almost

15   a decade ago.

16   Q.   Can we have 1101.

17        Do you see what's been marked as Exhibit 1101 up on the

18   screen, Ms. Trites?

19   A.   Yes.

20   Q.   And this is another deed of trust that you would have

21   prepared?

22   A.   Again, possibly myself, Al Kirkpatrick, or Laura Pezzi.

23   It's another one of Golden Hills Trust's properties.  Those

24   were Al's.

25   Q.   As far as Al was concerned, where physically was he

1   located?

2   A.   In Oceanside, California.

3   Q.   So near you down in Southern California?

4   A.   Near me, yes.

5   Q.   Did you ever meet with Al personally to go over anything

6   that's part of this process?

7   A.   I met with him a few times.

8   Q.   How many?

9   A.   Maybe a dozen.

10  Q.   And do you recall the nature of those conversations?

11  A.   Not specifically.

12  Q.   Did you provide him documents during these meetings?

13  A.   It's possible.

14  Q.   Did you share information with Mr. Kirkpatrick during

15  these meetings?

16  A.   Can you be more specific?

17  Q.   Sure.  Information that Chris had shared with you

18  regarding the process, did you share that with him?

19  A.   No.  Chris would have shared that with him directly.

20  Q.   When you began testifying yesterday, you shared with us

21  how you met Chris.  You met Chris at a seminar of some sort?

22  A.   Correct.

23  Q.   What kind of seminar was it?

24  A.   It was a seminar put on by Winston Shrout.

25  Q.   What was the topic of that seminar?

1    A.    Administrative remedies.

2    Q.    What does that mean?

3    A.    How to find solutions to different problems.

4    Q.    Like foreclosures?

5    A.    I don't believe that was ever one of his specific topics

6    that I recall.

7    Q.    And then Chris came to you how long after that meeting to

8    discuss this mortgage relief process that he was working on?

9    A.    I believe a few weeks later he contacted me and asked me

10   if I wanted to sell a property for him.

11   Q.    Do you recall where that property was?

12   A.    I do not.

13   Q.    Do you recall whether it was one of the properties that

14   you were shown yesterday or today?

15   A.    I don't believe so.  I believe it was a property that he

16   had done through his process prior to any information I had

17   about it.

18   Q.    Sorry, can we go back to 1103, please.  1102, I'm sorry.

19         Up on the screen now is Government's 1102.  Do you see

20   that?

21   A.    Yes.

22   Q.    And again this is a document that you would have

23   prepared?

24   A.    Again, possibly.  Michael Romano worked for

25   Al Kirkpatrick.

1   Q.   And Chris's name is not on here either, correct?

2   A.   No.  It is not.

3   Q.   Could we have 1201.

4        Do you see that, Ms. Trites?

5   A.   Yes.

6   Q.   And GJZ Group, who is part of that group?

7   A.   George Larsen, two other gentlemen, Jesus and Zel.  I'm

8   sorry.  I don't recall their last names.

9   Q.   Jesus Berrios?

10  A.   Yes.

11  Q.   And who was the third person?

12  A.   Zel.

13  Q.   And this deed of trust, another document that you would

14  have prepared?

15  A.   Again, probably prepared the template.  I don't know if I

16  specifically did this.  Laura Pezzi also worked for

17  George Larsen.  She may have done it as well.

18  Q.   Did you ever have in-person contact with anyone with GJZ

19  Group?

20  A.   I met George Larsen a few times.  I believe I met Zel

21  once.

22  Q.   Were there ever any meetings that the group of you would

23  all be at?

24  A.   There were a few group meetings.

25  Q.   How many?

1    A.   Two, I believe.

2    Q.   One in Las Vegas?

3    A.   Correct.

4    Q.   And the other one in Burlingame?

5    A.   Correct.

6    Q.   Do you recall when those meetings took place?

7    A.   I do not.

8    Q.   Can we have 1104, please.  I'm sorry, 1204.

9         Up on the screen now is what's been marked as 1204.  Do

10   you see that, ma'am?

11   A.   Yes.

12   Q.   And this is a Substitution of Trustee and Deed of

13   Reconveyance that you would have prepared?

14   A.   Again, possibly, yes.  I'm not sure who Erik Ramsey's

15   property was with.

16   Q.   And again, Chris's name is not on this document,

17   correct?

18   A.   No.

19   Q.   Can we have 1301, please.

20        Up on the screen now, Ms. Trites, is a deed of trust with

21   a return address of GJZ Group again?

22   A.   Yes.

23   Q.   And this is a document that you would have prepared?

24   A.   Again, possibly.

25   Q.   If you didn't prepare this document, do you know who would

1    have?

2    A.   Again, it could have been George Larsen or Laura Pezzi.

3    Q.   Could we have 1203.

4         Up on the screen now, do you see that, Ms. Trites, 1203?

5    A.   Yes.

6    Q.   This is a Substitution of Trustee and Deed of

7    Reconveyance?

8    A.   Yes.

9    Q.   You prepared this document?

10   A.   Again, I may have.  Can I make a comment here.

11   Q.   Sure.

12   A.   At one point in the process a lot of this stuff was

13   automated.  So anybody could input the basic information and

14   basically check the forms, and they would just get printed out.

15   So a lot of the templates I may have initially typed up, but at

16   that point it was go in to Smartsheets, check the boxes, click

17   and print.

18   Q.   Okay.  And you put that information into Smartsheets?

19   A.   I did quite a bit of it, yes.

20   Q.   Because your primary role was to have these documents

21   ready for use by the franchisees, correct?

22   A.   Correct.

23   Q.   1204, another Substitution of Trustee and Deed of

24   Reconveyance.  Do you see that, Ms. Trites?

25   A.   Yes.

1    Q.   And with the caveat you just gave us, this would have been

2    a template that you would have prepared?

3    A.   Yes.

4    Q.   Do you know whether or not this is a document that you

5    filled the information in on?

6    A.   Again, I don't know specifically.

7    Q.   But it's possible?

8    A.   It's possible.

9            MR. ORTIZ:  1305, is that one in?

10           THE CLERK:  Yes.

11   BY MR. ORTIZ:

12   Q.   1305, do you see this document?

13   A.   Yes.

14   Q.   Okay.  This is a Substitution of Trustee?

15   A.   Yes.

16   Q.   Do you recognize this form?

17   A.   Not specifically.  I don't think it was used very often,

18   if it was.

19   Q.   Do you have any idea who prepared it?

20   A.   I do not.

21   Q.   1206.

22           THE CLERK:  I don't have a 1206 listed.

23           MR. ORTIZ:  Okay.  Can we go to 1501.

24   Q.   Up on the screen, Ms. Trites, is Trial Exhibit 1501.  Do

25   you see that?

1    A.    Yes.

2    Q.    And first, do you know who AFOG Group is?

3    A.    It was part of George Larsen's.

4    Q.    Did you ever meet with any of the principals in AFOG

5    Group?

6    A.    I don't know who the members were outside of George.

7    Q.    And this is a form deed of trust that you would have

8    either created the template on or uploaded into the

9    Smartsheets?

10   A.    Correct.

11   Q.    Do you know whether or not you put this information in for

12   this specific deed of trust?

13   A.    I do not.

14   Q.    But it's possible, right?

15   A.    It's possible.

16   Q.    1502, this is a Notice of Rescission.  Do you see that?

17   A.    Yes.

18   Q.    This is signed by Marya Merritt?

19   A.    Yes.

20   Q.    Do you know who she is?

21   A.    No.

22   Q.    Do you know whether you prepared this document?

23   A.    I do not.

24   Q.    Can we have 1504.

25         1504 is a Substitution of Trustee and Deed of

1  Reconveyance.  Do you see that, ma'am?

2  A.    Yes.

3  Q.    And do you know whether or not you put this information in

4  this form?

5  A.    I do not.

6  Q.    Can we have 1601.

7        1601 is a form that you were shown earlier that has

8  Mr. Castle's name on it, correct?

9  A.    Correct.

10  Q.    Do you know whether or not he executed this document?

11  A.    I don't know.  I would have to see the signature page.

12  Q.    If we could go to the second-to-the-last or page 16 of

13  that exhibit, please.  So this is the signature page of this

14  document.  Do you see that?

15  A.    Yes.

16  Q.    And Chris's name is not on there, is it?

17  A.    No.

18  Q.    Can we have 1701.

19        This is a document that has your name at the top?

20  A.    Yes.

21  Q.    And were you at that address back in April of 2010?

22  A.    Yes.

23  Q.    You prepared and had this document recorded?

24  A.    Yes.

25  Q.    1703, I think you were shown this document on Wednesday,

1   but does it look familiar to you, ma'am?

2   A.   Yes.

3   Q.   And this is a document that you would have created?

4   A.   Yes.

5   Q.   Did you record this document as well?

6   A.   I don't recall.  Larry Todt may have recorded it.  He may

7   have actually recorded the last one.  He lived up there.

8   Q.   But it may have been you or him?

9   A.   It could have been.

10  Q.   1704, it's called Substitution of Trustee and Deed of

11  Reconveyance.  Do you see that?

12  A.   Yes.

13  Q.   Two questions on this, the first one is do you know

14  whether you were the one that put the information in this

15  document?

16  A.   Again, possibly.

17  Q.   And is it also possible that you recorded it?

18  A.   I went to the record's office in Orange County one time.

19  So I did record something.  I don't know which document it was.

20          THE COURT:  Mr. Ortiz, it's 11:15.

21          MR. ORTIZ:  Okay.  Thank you.

22          THE COURT:  We'll take a recess, ladies and gentlemen,

23  until 11:45.  Please don't discuss the case or form any

24  opinions during that recess, period.  We'll see you back at

25  11:45.  Thank you.  We're in recess.

1          (Recess taken 11:15 a.m. to 11:51 a.m.)

2          THE COURT:  All right.  Mr. Ortiz, you may continue

3   please.

4          MR. ORTIZ:  Thank you.

5   Q.   Ms. Trites, just a couple more questions, okay?  You

6   mentioned this morning there were times where there were issues

7   with the title companies and them not wanting to work with

8   certain members of the group; do you remember talking about

9   that generally?

10  A.   Yes.

11  Q.   And how often did that issue come up?

12  A.   It didn't come up in the beginning, but towards the end it

13  came up more and more.

14  Q.   And when it did come up, you would be contacted by the

15  franchisee specifically, right, and you were told that there

16  were these problems?

17  A.   It could have been from the franchisee.  It could have

18  been from Chris or John.

19  Q.   Do you recall testifying about this issue at the last

20  hearing -- at the last hearing on this?

21  A.   Yes, in general.

22  Q.   And you were asked whether there were -- whether any of

23  the franchisees contacted you or whether you contacted any of

24  the franchisees about title issues.  Do you remember that, that

25  general nature of questioning?

1   A.    Yes.

2   Q.    And you clarified the question and said, no, it would have

3   been them contacting you regarding the questions regarding

4   title.  Do you remember talking about that at the last

5   trial -- at the last hearing?

6   A.    In general, yes.

7   Q.    That would have been true with Mr. Larsen, as well as

8   Mr. Todt and the others?

9   A.    Those were the two defendants in the other trial, yes.

10  Q.    And then finally, in relation to the letters that we

11  discussed, you said earlier that you put the information in

12  that went to the lenders; is that a fair statement?

13  A.    Again, are those the letters that Chris drafted that we

14  submitted?

15  Q.    Whatever documents went to the lenders, you were the one

16  that always filled that information out, didn't you?

17  A.    No.  That is not correct.  As I state earlier, in the

18  beginning, I didn't have access to those documents.  They were

19  completed by Chris, John, or Joshua Smith.

20  Q.    Do you recall testifying previously that the documents

21  that actually went to lenders, I was the one who filled those

22  out, had John sign them, and then mailed them?

23  A.    Yes.  Later in the process that was correct.

24  Q.    So in relation to what you sent to the lenders, you filled

25  the information out, you had John sign them, and then you

1   mailed them out, right?

2   A.   Again, later in the process I did.  In the beginning, I

3   did not have access to those.  I did not fill them out.  I did

4   not sign them.  I did not send them.

5   Q.   If that's true, Ms. Trites, then why didn't you say that

6   when you testified the last time?

7   A.   I'm sorry if I was not clear and accurate.

8   Q.   Because they were your words that you testified to, right?

9   You were responding to a question about your role in this, and

10  you specifically said that anything that went to the lenders

11  you filled out?

12  A.   Again, my apologies if I wasn't completely accurate.  I

13  did not do that in the very beginning.  I did not have access

14  to the documents.  Chris kept them very secret and

15  confidential.  John did that.  He worked with a gentleman named

16  Joshua Smith.  They sent those out.  They would notify me when

17  those were done.  And then the process would continue.  There

18  was a point when that changed, and then I was sending them

19  out.

20  Q.   So I understand you're saying that now.  But when you were

21  asked the question before, you never said any of these things,

22  did you?

23  A.   I don't recall specifically.  If I wasn't clear and

24  accurate, again, I apologize.

25  Q.   And in relation to the letters themselves, were you

1    responsible for mailing those out?

2    A.    At the point in time at which I started doing that, yes.

3    Q.    And you would receive a response from the lender if there

4    was one; is that right?

5    A.    I'm not sure I understand what you're asking.  If they

6    sent a response, would I receive it in the mail?

7    Q.    Yes.

8    A.    Yes.

9    Q.    And you rarely, if at all, received any responses, true?

10   A.    That would be correct.

11   Q.    And you knew what the effect of, as far as this process is

12   concerned, with the lack of response by the lenders, didn't

13   you?

14   A.    Again, I'm not sure I understand what you're asking.

15   Q.    If the third letter wasn't responded to, what was your

16   understanding of the effect of that?

17   A.    Then we just proceeded with the process.

18   Q.    Your understanding was the effect was that the lender no

19   longer had any right to the loan, true?

20   A.    That was how Chris described it, yes.

21   Q.    And that's how you understood the effect to be, true?

22   A.    Again, at no time did that give us authorization to do

23   that.

24   Q.    That wasn't my question though.  My question was, your

25   understanding was that when there was no response to this third

1  letter, the effect of it would be that the bank lost its right

2  to the loan, true?

3  A.   I don't think I understand that.

4  Q.   You think if I showed you a copy of your words that you

5  used at the last hearing, that might refresh your memory?

6  A.   That would be preferred.  Thank you.

7         MR. ORTIZ:  Your Honor, may I approach?

8         THE COURT:  Yes.

9         MS. HEMESATH:  What page, Mr. Ortiz?

10         MR. ORTIZ:  I'm sorry, 311, please, lines 3 through 7.

11  Q.   So if you would read to yourself, Ms. Trites, starting

12  with the word "now" on line 3 and ending with the word "loan"

13  on line 7.

14  A.   Thank you.

15  Q.   So in reviewing your testimony from the last time, that's

16  what you testified to, right, that your understanding was that

17  the effect of a nonresponse to the third letter stripped the

18  bank of their rights?

19  A.   That was my understanding from what Chris had told us,

20  yes.

21         MR. ORTIZ:  All right.  Thank you.  That's all I have.

22                      REDIRECT EXAMINATION

23  BY MS. HEMESATH:

24  Q.   So these letters that we were just hearing about, I want

25  to bring up, please, page -- or excuse me, Exhibit 823 which is

1    the contract.  This is just an example.

2         So this is the CCTT contract with the Thompsons; do you

3    see that?

4    A.   Yes.

5    Q.   And the date of this contract is approximately when?

6    A.   October 6, 2010.

7    Q.   And then if we can put up, please, next to this

8    Exhibit 801.

9         While that's coming up, so October 6, 2010, that's the

10   date this homeowner enrolls in your program?

11   A.   Yes.

12   Q.   And could you send out those three letters that Mr. Ortiz

13   was referring to before the homeowner enrolled in the

14   program?

15   A.   No.

16   Q.   What's the recording date on this deed of trust?

17   A.   October 18th, 2010.

18   Q.   So 12 days after these homeowners enrolled in your

19   program, what was filed?

20   A.   The deed of trust.

21   Q.   Was it a real deed of trust?

22   A.   No.

23   Q.   In those 12 days, had you already sent those letters that

24   Mr. Ortiz was talking about to the banks and receive responses

25   from the banks?

74

1   A.   It's possible that the first one may have already been

2   mailed.

3   Q.   Anything more than that possible in that time frame?

4   A.   The rest of the documents would have been completed.  The

5   Shon-te-East-a documents, those would have been done at the

6   same time.

7   Q.   Any hesitation in filing this fake deed of trust before

8   you received this communication or sent communication to this

9   bank?

10  A.   No.

11  Q.   In other words, is it fair to say that as soon as you

12  enrolled a homeowner in the program, you were going to file

13  this fake deed of trust?

14  A.   Yes.

15  Q.   Did you ever have a conversation with Mr. Castle in which

16  he said, whoa, whoa, we have to wait until these three letters

17  we send to the banks go out?

18  A.   No.

19  Q.   Let's pull up, please, Exhibit 1602 -- oh, excuse me,

20  1601.  This is that deed of trust on Laura Pezzi's property; do

21  you see that?

22  A.   Yes.

23  Q.   And is this a real or a fake deed of trust?

24  A.   It's a fake deed of trust.  No money changed hands.

25  Q.   And who is pretending to be the lender on this deed of

1  trust?

2  A.   Chris Castle on behalf of Oreplex International, LLC.

3  Q.   And do you recognize that address from earlier this

4  morning?

5  A.   Yes.  That is the address he used for Oreplex

6  International.

7  Q.   In your experience with these recorded documents, what

8  would happen once the document was recorded at the county

9  recorder's office in terms of mailing?

10  A.   The original would get mailed back to the address listed

11  in the "after recording return to."

12  Q.   So once this document was recorded at the county

13  recorder's office in Sacramento, it gets mailed to where?

14  A.   It gets mailed to Chris Castle in regards to Oreplex

15  International at the address listed.

16  Q.   Did it ever come up, did you ever have a conversation with

17  him when he said, hey, whoa, I got this deed of trust in the

18  mail, and that wasn't supposed to happen; I never authorized

19  this?

20  A.   No.

21  Q.   Let's bring up, please, Exhibit 101, which Mr. Ortiz

22  showed you.  And you indicated up here, whose entity was Golden

23  Hills Trust?

24  A.   Al Kirkpatrick.

25  Q.   And I think what you said before was that Golden Hills

1    Trust did not have to do with Mr. Castle; do you remember

2    saying that?

3    A.    Yes.

4    Q.    Was Mr. Castle aware of the Golden Hills Trust entity?

5    A.    Yes.

6    Q.    How was he aware of it?

7    A.    The unincorporated associations were, I guess, Chris's

8    idea.  He gave me the template for that when we first did CCTT

9    Group.  All the other entities that you see after that Golden

10   Hills Trust, GJZ Group, AFOG Group, those were all

11   unincorporated associations.  Chris was aware of all of them.

12   Q.    And can we pull up side by side to this Exhibit 51.

13         And we see that specifically reflected here in this email.

14   This email is from Mr. Castle; do you remember that?

15   A.    Yes.

16   Q.    And he's acknowledging what a great job the Al Kirkpatrick

17   group is doing?

18   A.    Correct.

19   Q.    Let's look at page 2 of this -- of Exhibit 51 just by

20   itself.  You were asked earlier about the Smartsheets.  I'm

21   going to get that specific paragraph.

22         If you could just get that one, is that possible, right

23   here?  Yeah.

24         This is in that same email from Mr. Castle on the second

25   page; do you see that?

1   A.    Yes.

2   Q.    Why don't you go ahead and read that for us.

3   A.    (Reading) "The internal system currently set up and that

4   which we will be implement -- and that which will be

5   implemented shortly will further streamline the process and

6   will complement the Smartsheets.  I am told that the

7   Smartsheets are fully updated at this point.  As you check your

8   status sheets for properties, if there is anything amiss, make

9   note of the specifics and make sure you email them to Tiffany,

10  Amy, Tisha, and myself, and we will make every effort to get it

11  rectified ASAP."

12  Q.    Who is the "myself" in that sentence?

13  A.    That would be Chris Castle.

14  Q.    So if somebody had problems with their properties,

15  specifically the documents and the Smartsheets, who were they

16  supposed to go to?

17  A.    Tiffany, Amy, Chris, and myself.

18  Q.    I want to bring up another exhibit, 1730.  We talked about

19  this one last week.  Do you recognize this demand letter?

20  A.    Yes.

21  Q.    And it's a demand letter from Chris Castle to the escrow

22  saying please pay me?

23  A.    Correct.  It's giving them the bank routing information

24  for CCTT.

25  Q.    Anywhere in this demand letter that Chris Castle says,

1  hey, escrow company, we sent out these three letters to the

2  banks, and the note got separated from the mortgage; and that

3  means the bank no longer held title, and I filed some

4  documents, so now I am holding the lien on this bank?  Anywhere

5  in that demand letter say anything like that?

6  A.  No.

7  Q.  Was it ever explained to the escrow companies what you

8  were doing on these homes?

9  A.  No.

10 Q.  And last one, Exhibit 1302, this is the Notice of

11 Rescission signed by Mr. Castle on the Stone Drive property.

12 Do you remember that from last week?

13 A.  Yes.

14 Q.  Was this a real Notice of Rescission from a real bank?

15 A.  No.

16 Q.  It was not authorized?

17 A.  No.

18 Q.  Anywhere in this Notice of Rescission indicate, hey, we

19 sent these three letters to the banks, and they didn't respond

20 or they didn't respond in the right way, and therefore, we are

21 knocking those banks off title?

22 A.  No.

23        MS. HEMESATH:  Nothing further.

24        MR. ORTIZ:  Can you pull up that exhibit again, 1302,

25 please.

1    THE CLERK:  Sorry, which exhibit?

2    MR. ORTIZ:  1302.

3                    RECROSS-EXAMINATION

4    BY MR. ORTIZ:

5    Q.   Do you see that document on your screen, Ms. Trites?

6    A.   Yes.

7    Q.   And this is the Notice of Rescission of Notice of Default,

8    right?

9    A.   Correct.

10   Q.   Are you aware of what effect this document had on this

11   loan, if any?

12   A.   Yes.

13   Q.   What was it?

14   A.   The property was in default, meaning a foreclosure had

15   been started.  This would have removed that foreclosure.

16   Q.   Are you aware that there was no record of a notice of

17   default being recorded on this property?

18   A.   I do not know.

19   Q.   Because this document would only have effect if there was

20   a notice of default filed, correct?

21   A.   I believe so.

22   Q.   Can we go back to 801.

23        You were shown this document in relation to the contract

24   that was signed by the Thompsons.  Do you remember being asked

25   some questions about that?

1    A.    Yes.

2    Q.    And this deed of trust is recorded just a few days after

3    that contract is signed, right?

4    A.    Correct.

5    Q.    But this deed of trust doesn't strip the bank of any

6    rights, does it?

7    A.    Not that I'm aware of.

8    Q.    It's not until the Substitution of Trustee and Deed of

9    Reconveyance is recorded that there is a removing of the bank

10   as the lender, right?

11   A.    Correct.

12   Q.    And the substitution in this case, which is 804, can we

13   see that, please.

14         Do you see that document, ma'am?

15   A.    Yes.

16   Q.    And this is dated January 12th of 2011?

17   A.    It looks like it was recorded on January 19th.

18   Q.    Yes.

19   A.    Yes.

20   Q.    That's more than three months from the date that the

21   Thompson contract was signed, correct?

22   A.    Yes.

23         MR. ORTIZ:  Thank you.  That's all I have.

24         MS. HEMESATH:  Nothing further, your Honor.

25         THE COURT:  Thank you very much.  You're excused.

1          THE WITNESS:  Thank you.

2          (End of excerpt.)

3                         --oOo--

4    I certify that the foregoing is a correct transcript from the

5    record of proceedings in the above-entitled matter.

6                         /s/ Kacy Parker Barajas
                    _____
7                   KACY PARKER BARAJAS
                    CSR No. 10915, RMR, CRR, CRC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25