1             IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
2             BEFORE THE HONORABLE JOHN A. MENDEZ

3    UNITED STATES OF AMERICA,

4                     Plaintiff,
     vs.                          Sacramento, California
5                                 No. 2:15-CR-000190
                                  Monday, August 2, 2021
6    JAMES CHRISTOPHER CASTLE,    9:36 a.m.

7                     Defendant.
     _____/
8

9                        --oOo--

10            REPORTER'S EXCERPT OF JURY TRIAL

11                  CLOSING ARGUMENTS

12                       --oOo--

13   APPEARANCES:

14   For the Government:     UNITED STATES ATTORNEY'S OFFICE
                             AUDREY B. HEMESATH
15                           Assistant U.S. Attorney
                             TANYA B. SYED
16                           Assistant U.S. Attorney
                             501 I Street, Suite 10-100
17                           Sacramento, CA  95814

18   For the Defendant:      ORTIZ LAW GROUP, PC
                             JESSE ORTIZ, III
19                           Attorney at Law
                             1510 J Street, Suite 100
20                           Sacramento, CA  95814

21   Official Reporter:      KACY PARKER BARAJAS
                             CSR No. 10915, RMR, CRR, CRC
22                           UNITED STATES DISTRICT COURT
                             501 I Street
23                           Sacramento, CA  95814
                             kbarajas.csr@gmail.com
24
     *Proceedings recorded by mechanical stenography.  Transcript*
25   *produced by computer-aided transcription.*

1          SACRAMENTO, CALIFORNIA, MONDAY, AUGUST 2, 2021, 9:36 AM

2                                   --oOo--

3          (Prior proceedings taken down but not transcribed.)

4          MS. SYED:  During this trial we took you back to 2010

5    when the defendant, Chris Castle, figured out a way to cheat

6    banks out of money.  He came up with this entire fraud using

7    fake documents to make it seem as if monies owed to the banks

8    had been paid off, selling the houses out from under the banks,

9    and pocketing the money.  He recruited people to take this

10   entire fraud nationwide putting 140 to 150 houses through this

11   process with CCTT Group raking in over 1.7 million on the 15

12   properties that you have seen charged in this case.  And you've

13   also seen hundreds of thousands of dollars go into the

14   defendant, Chris Castle's, pocket.

15         You've seen the evidence during this trial, and this

16   chart in front of you shows you how the exhibits are organized

17   by property.  And you'll have a chance to see these exhibits

18   again when making your determination, which brings us to the

19   important part, the jury, you.  What is your role in the

20   process?  You will examine the evidence or facts that were

21   presented in trial, and you'll decide what weight to give each

22   piece of evidence.

23         The judge will instruct you on the law, and you will

24   take that law and apply it to determine if Castle is guilty of

25   the charges.

1          So what are these charges?  There are three main

2     categories, as you can see in front of us, and I will go

3     through these in order.  The first category on the top that we

4     will go through will be bank fraud.  The second category in the

5     middle, falsely making lending association writings, and that

6     last category will just be a conspiracy to do those two things

7     on the top.

8          Now as the judge has mentioned, the United States

9     bears the burden of proof to show that Castle is guilty on each

10    of these charges beyond a reasonable doubt, and all that means

11    is that you can use your reason and common sense to make that

12    determination.  And when you're reaching that determination,

13    for each charge there will be a series of elements.  All that

14    is is something that the government is required to prove.  Once

15    we prove it, you can check it off.  And once all of the

16    elements have been found for a charge, you can find Castle

17    guilty on those.

18          So let's discuss that first category of charges, bank

19    fraud.  There are three elements that you will check off to

20    determine that Castle is guilty of bank fraud:  First, that the

21    defendant knowingly executed or attempted to execute a scheme

22    to defraud a financial institution as to a material matter;

23    second, that the defendant did so with the intent to defraud

24    that financial institution; and third, that the financial

25    institution was insured by the Federal Deposit Insurance

1    Corporation.

2           Now Castle can be found guilty of bank fraud even if

3    he did not personally commit the acts constituting bank fraud.

4    If he willfully caused an act to be done, that if directly

5    performed by him, would be bank fraud.  If Castle put it into

6    motion or caused the commission of an indispensable element, he

7    may be found guilty as if he had committed this fraud himself.

8           And you know that Castle was at the top of the entire

9    scheme.  He came up with what he called intellectual property

10   which was just a way to cheat banks out of money.  And you

11   heard from Erik Ramsey that he was the closer.  From Al

12   Kirkpatrick, that Castle was the person who to go to with any

13   problems.  From Tisha Trites, that Castle came up with the

14   entire plan, and you heard it from himself, Castle himself,

15   that this was his idea.  This was his scheme.

16          And what was the scheme?  Two steps.  You have seen

17   these documents over and over again during this trial.  Step

18   one, file a fake deed of trust.  Why is it fake?  Because it

19   was a deed for a loan that was never made, and that is not in

20   dispute.

21          Step two, file a fake deed of reconveyance.  Again,

22   why is that fake?  Because it made it seem as if the banks had

23   been paid off when they hadn't.  And again, that is not in

24   dispute.

25          And sometimes you even saw that the homeowners were so

1    behind on their payments that the banks filed a notice of

2    default.  And all that said was that they were going to start

3    foreclosure proceedings.  And that's when you saw another fake

4    document, a fake notice of rescission taking away the bank's

5    notice of default when again that was not true.  And that is

6    not in dispute.

7          To make it simple for you, this chart right here shows

8    the counts for bank fraud and how it matches up with the

9    exhibits and the exhibit documents in the series.  This

10   PowerPoint is not in evidence, and it's not going to be in the

11   room with you when you're making the decision.  So I'll leave

12   this up for a moment in case you would like to copy this down.

13         Now as you have seen, this scheme works in the same

14   way for each of these counts, and because it works the same

15   way, I'm not going to go through each of the counts with you.

16   But what I will do is go through one example to show you how to

17   tie the evidence together.  So let's go through count 23.  At

18   Government Exhibit 1301, you see this fake deed of trust.  And

19   what does it show you?  It makes it seem like under that

20   section B, the borrower, Joan Hangarter, received a loan at

21   that section C from a lender, GJZ Group, at section E for

22   $950,000.  But you heard from Joan Hangarter herself on this

23   deed that that loan never happened.

24         But in general, all of the deeds of trust had that

25   same issue, that there was never a loan given for those

1   documents.  You heard this from Tisha Trites who told you, as

2   part of the scheme, they never lent my money to any homeowner.

3   You heard this from Al Kirkpatrick.  You heard this from Castle

4   himself.  Which means that these deeds of trust, an essential

5   part of this scheme to defraud, were fake.

6          Which brings us to the next document, the false deeds

7   of reconveyance at Government Exhibit 1304.  You can see the

8   false deed of reconveyance for this example.  And here you can

9   see Marya Merritt signing on behalf of BAC Home Loans, and you

10  heard from Marya Merritt that she never worked for them; and

11  she was never authorized to sign this document.  You also heard

12  the Bank of America say this loan had never been paid off.  So

13  again, a fake document.

14         But all of the deeds of reconveyance that you saw were

15  fake.  And why were they fake?  You heard from some of the

16  banks who told you that these loans were never paid off.  You

17  also saw signatories, Marya Merritt signing at Government

18  Exhibit 1203, 1502, and 1304 for different banks when she told

19  you that she was not authorized to sign on behalf of these

20  banks.  Brianna Hansen signing at Government's Exhibit 104, 77,

21  71, and 62, again telling you she was not authorized to sign.

22  She didn't know what these documents said.  She just signed

23  them because someone who was like a mom to her asked her to

24  sign them.  What does that tell you?  That these documents were

25  fake, part of the knowing scheme to defraud.

7

1          Now Castle didn't sign all of these deeds himself, but
2     he didn't have to sign them to be responsible.  It is enough
3     that he willfully caused these documents to be filed, which he
4     did, by coming up with the scheme and putting the entire scheme
5     into motion.  And sometimes when the scheme didn't proceed
6     smoothly, who did they go to?  Castle.
7          Sometimes there were roadblocks.  Here's an example of
8     a roadblock in this property where the bank realized that the
9     homeowner was so far behind on payments that they filed a
10    notice of default.  And what did that notice of default do?  It
11    just notified the world that the homeowner was behind on her
12    payments.
13         So Castle came up with another fake document, the
14    notice of rescission.  The notice of rescission took away the
15    bank's notice of default.  But you saw on the signature, you
16    saw the Bank of America tell you that Recontrust Company was a
17    subsidiary, and they had not authorized this document to be
18    filed, that Chris Castle was not an employee, and he was not an
19    authorized representative.
20         Now Castle, he jumped around a bit on whether he
21    signed this document through a wet signature, a digital
22    signature, or a stamp.  But even through the most generous
23    interpretation, if he did not sign that document himself but
24    did it through a stamp, he was very clear that he meant for
25    this document to be signed, another fake document to make it

1    seem as if Bank of America had been paid, part of the scheme to

2    defraud, because once all of these fake documents had been

3    filed, the properties could be sold.  And they were sold, and

4    Castle received a portion of the money from those sales.

5          This Exhibit 1340 you saw was prepared by Forensic

6    Analyst Monica McGuire which shows every step of the process

7    including the eventual sale and disbursement of the proceeds.

8    And this chart exists for every property in this case.  And for

9    every property in the exhibits, it's number 40, so 140, 240,

10   340.  The 40s are this chart.  And this example we just went

11   over, you can see in that red circle how much went to CCTT

12   Group, Chris Castle/Tisha Trites' group, $118,992.

13         And you saw at Exhibit 80 a summary chart also

14   prepared by Forensic Analyst McGuire that shows you how much

15   money went into CCTT Group from the sale of just the properties

16   related to the charges you are determining today,

17   $1,746,547.32, a bank account that you heard was in Castle's

18   control.  Forensic Analyst McGuire told you that he wrote the

19   checks.  He controlled the account.  He acknowledged that he

20   could take the money whenever he wanted which shows that, as a

21   scheme to defraud, it was knowing.  Castle knew how much money

22   he was getting from the scheme, and it was material because it

23   mattered.  And Exhibit 83 shows you a sample of some of the

24   money that went into Castle's personal accounts.  This wasn't

25   just a scheme to defraud.  This was a successful scheme to

1    defraud with money lining Castle's pockets.

2          So for each bank fraud charge, you can now check off

3    that first element, knowing scheme to defraud, and we can go to

4    the second element.  Intent to defraud.  We saw at Government

5    Exhibit 51 Castle's email at chris@oreplex.com, an email that

6    was identified as Castle's email by Tisha Trites, by

7    Al Kirkpatrick, and by Castle himself, an email that he said he

8    sent out.  And what does he say in this email?  These are my

9    thoughts.  I met with John and Tisha, and this is how I am

10   going to -- how we are going to eliminate confusion and

11   resistance.  This shows that Castle had the intent to defraud.

12         And in that same email, he called out Al Kirkpatrick

13   for doing an excellent job.  And what did Al Kirkpatrick say

14   that meant?  He said, and I quote, that is code for you're

15   making me a lot of money because he was making a lot of money.

16         And another example of this intent to defraud you saw

17   at Government Exhibit 1234 where Castle sends another email

18   where he says the fact that they sold this off to an

19   unsuspecting third-party debt collector, and at the end he says

20   I am thinking by then the entire system will have collapsed.

21   Again, this email shows you that Castle had an intent to

22   defraud with his scheme.

23         You see this again at Government Exhibit 1630 where

24   people are asking Castle what to do when roadblocks come up in

25   this scheme, and Castle helps remove those roadblocks so that

1    the scheme can continue because he has an intent to defraud.

2         And in this one, when Kirkpatrick was asked why he

3    went to Castle with his question, Kirkpatrick told you he

4    thought it was best to go straight to the horse's mouth.

5         And you also saw at the top of all of these fake

6    documents were addresses, but they weren't addresses for the

7    bank.  They were addresses for people who were part of the

8    scheme.  You see this at Government Exhibit 1601 where on this

9    deed of trust Castle and his entity and his entity's address is

10   at the top of this document.  Why?  Because when the county

11   recorder's office sends mail regarding this filing, he didn't

12   want it sent to the banks because then the banks would be

13   notified of the scheme.  Again, an intent to defraud.

14        And at the end of the day they made money.  This email

15   at Government Exhibit 53 shows you that Castle could take money

16   out at any time.  It says Chris and John can take withdrawals

17   from CCTT at any time, and he agreed with that.  He knew about

18   the money coming in, and he had this intent to defraud.

19        And at some point they added in the concept of a

20   church.  Why?  Well, because as Tisha Trites said, people don't

21   expect religious organizations to be illegitimate.  All of this

22   allows you to check off that next element, intent to defraud

23   for all of the bank fraud counts.

24        And it takes us to the third element which is the

25   easiest element.  This is not in dispute.  A bank for each

1  charge was FDIC insured.  You heard it from the FDIC witness.

2  And all of the FDIC certificates are in the exhibits at 30 to

3  42.  And that lets you check off the final element of bank

4  fraud which allows you to find that Castle is guilty on all of

5  these counts of bank fraud that you copied down earlier.

6         But it turns out that this scheme actually violated

7  more than one type of statute.  And for the second group of

8  charges we'll actually be seeing an overlap with bank fraud.

9  The second group of charges is focusing on a very specific part

10  of the scheme.  The second group of charges is falsely making

11  lending association writings.  And this has two elements.  So

12  let's break them down.  The first element, that the defendant

13  knowingly falsely made a writing.  And second, that writing was

14  made an imitation of a lending association document.

15         Now again, Castle may be found guilty of falsely

16  making a lending association writing even if he did not

17  personally do it, if he willfully caused an act to be done that

18  if directly performed by him, would be a violation of the

19  statute.  If he put it into motion or caused the commission of

20  the offense, of an indispensable element of the offense, he may

21  be found guilty as if he had committed the offense himself.

22  And again, this chart shows you which charges match up with

23  which exhibits, and I'll give you a second to copy this one out

24  for the second category of charges.

25         Now we have already talked about the bank fraud counts

1   and how the scheme generally worked.  You've seen in trial how

2   Castle's leadership in the scheme worked and how he came up

3   with this idea, how he put this into action.  The charges for

4   falsely making lending association writings focuses on a

5   specific part of the scheme, the false documents that Castle

6   caused to be filed.  Because again, Castle did not have to sign

7   those documents to be guilty of falsely making those, falsely

8   making lending association writings.  He just had to have

9   willfully caused those documents to be filed.

10          And again, because this scheme worked the same way,

11  I'm not going to go through every count, but I will go through

12  one of the counts, count 4, to show you an example of the

13  analysis of the evidence.  And so at count 4 you see at

14  Government Exhibit 202 this fake deed of reconveyance being

15  filed.

16          And again, you heard testimony from Jason Young,

17  Daniel Young's son, that his dad never worked for a bank.  So

18  you know that he wasn't authorized to sign this document.  But

19  in general, we went over all of these fake documents, and you

20  saw in trial how each of these documents was fake and how

21  Castle caused each of them to be filed.  And again, Castle

22  didn't have to sign them himself to cause them to be filed and

23  to be responsible.  And so that first element, knowingly making

24  a false writing, can be checked off.

25          And so we move on to that second element, imitating a

1    lending association writing.  And again, you heard from an FDIC

2    representative that a bank on each of the counts was FDIC

3    insured and was a bank, and so all of these documents when

4    signed as an authorized representative on behalf of a bank or

5    an employee on behalf of a bank, when fake, were an imitation

6    of this lending association writing, and so you can check off

7    that second element.

8          And that shows that Castle can be found guilty on all

9    of these counts that you previously copied down.  For the

10   second category of charges, you can check that off.

11         And so we've gone over bank fraud, and we've gone over

12   falsely making a lending association writing.  Which brings us

13   to the final count, and based on what we've already covered,

14   this one will be simple because this is a conspiracy to do the

15   first two things that we covered.  There are three parts, three

16   elements to find that Castle is guilty of a conspiracy to

17   commit bank fraud and to falsely make lending association

18   writings.

19         The first element is an agreement.  It's an agreement

20   to commit a crime.  It simply is an agreement between two or

21   more people to commit that crime.  It doesn't need to be

22   formal.  It doesn't need to be written.  It simply needs to be

23   a meeting of the minds to commit the crime.

24         The second element that the defendant, Castle, was a

25   knowing member of the agreement.  For the second element, each

1    person to the agreement has to be a knowing member.  That

2    doesn't mean that each person has to know all of the

3    co-conspirators or what each of the co-conspirators was doing,

4    but it means that each member has to have the intent to further

5    the unlawful purpose of the agreement.

6         And third, there was at least one overt act.  For the

7    third element, an overt act is simply some action done by a

8    member of the conspiracy for the purpose of carrying out the

9    agreement.  So first, was there an agreement?  Well, you heard

10   from Tisha Trites who told you that there was an agreement that

11   Castle had a stamp sent to her to stamp on each of these

12   contracts with the homeowners.  Sometimes you don't get a

13   written down agreement, but in this case, parts of their

14   agreement were actually written down.  You heard Castle himself

15   say that he had sent the stamp to Tisha Trites for that

16   purpose.  And in fact, you heard him say that that contract,

17   that agreement is what entitled him to money from this scheme.

18        And you also heard Kirkpatrick talk about the

19   agreement what he had to sign with Castle, the agreement that

20   made him to have to give Castle a portion of the money.  So

21   there was an agreement, and you can check off that first

22   element.

23        The second element, was Castle a member of this

24   scheme?  He came up with it he came up with the scheme, and he

25   didn't know what every single co-conspirator was doing, but he

1   did because he saw the money come into the bank accounts.  And

2   he took out that money, so he knew which properties were being

3   sold.  So he was a member of this agreement.

4         And as far as -- and so you can check off that

5   element, and we can go to the third and final element, an overt

6   act, which you've seen in the false documents that were filed

7   over and over again that are on the charts that you copied

8   down, that are on the bank fraud, and falsely making lending

9   association writing documents, accounts.  And so you can check

10  off that third element that there was an overt act.  And that

11  lets you check off that final category of charges.  At this

12  point we have gone through every single category of charges and

13  have proven why Castle is guilty on each of them.

14        I want to sincerely thank you for your time and

15  attentiveness during this trial.  And after you've had a chance

16  to consider the evidence in this case and be instructed on the

17  law by the judge, I would ask you to find that the government

18  has proved each of the elements for each of the charged counts

19  beyond a reasonable doubt.  I ask you to return the only

20  verdict supported by the evidence in this case, and that is a

21  verdict of guilty on all counts.  Thank you.

22        THE COURT:  Mr. Ortiz, closing argument.

23        MR. ORTIZ:  Thank you, your Honor.

24        As you just heard, the primary issue in this case is

25  whether or not Mr. Castle caused to be filed the substitution

1    of trustees and these deeds of reconveyance.  That is what your

2    focus is going to be during the course of your deliberations.

3    But even though there was no evidence at all that Mr. Castle

4    provided the information for those recorded documents, even

5    though there was no evidence at all that Mr. Castle formatted

6    those recorded documents, even though there was no evidence at

7    all that Mr. Castle created these documents, even though there

8    was no evidence at all that Mr. Castle distributed purported

9    documents, and even though there was no evidence at all that

10   Mr. Castle caused these documents to be recorded, he was

11   indicted.  He was indicted for the three charges that you heard

12   just now from the government.

13        But as the Court told you during jury selection and

14   again at the beginning of this trial, and Judge Mendez will

15   tell you once we are done arguing, the fact that the indictment

16   was filed isn't evidence of anything.  Mr. Castle pled not

17   guilty to all three of these charges.  And as Judge England

18   told you, once he did that, Mr. Castle is presumed to be

19   innocent unless and only if the government can prove his guilt

20   beyond a reasonable doubt.

21        Proof beyond a reasonable doubt is proof that leaves

22   you firmly convinced that Mr. Castle is guilty of what he's

23   being accused of.  Yes, you use common sense.  But obviously

24   the most important thing that you use in analyzing whether or

25   not the government has met its burden is the evidence itself.

1    And if after careful consideration of all of the evidence you

2    are not convinced, you are not convinced beyond a reasonable

3    doubt that Mr. Castle is guilty, not convinced beyond a

4    reasonable doubt that the government has met its burden, the

5    law obligates you and, as the instruction tells you, it will be

6    your duty to find Mr. Castle not guilty of these charges.

7          A lot of what you heard during the government's

8    initial argument was simply that.  It was argument.  It was not

9    supported by the evidence.  And at times, what was argued to be

10   facts, what was argued to be evidence never happened.  And

11   that's why it was important, and that's why it's very important

12   that you understand.  And the law will tell you, Judge Mendez

13   will tell you, that nothing that the attorneys say is evidence

14   of anything, and that includes me.  Nothing that I said during

15   my opening statements, nothing that I'm going to say during

16   this argument is evidence.  Only what you saw and what you

17   heard from that witness stand, the exhibits that have been

18   introduced into evidence, and you will have all of those, only

19   those things are evidence.

20         And as jurors, it is your obligation to weigh all of

21   that.  And notwithstanding what I say, notwithstanding what

22   Ms. Syed said or Ms. Hemesath will say when she does her

23   rebuttal, you are the ones.  You are the jurors in this case.

24   So you and only you decide what happens.

25         The Court's going to give you the law that applies to

1  this case.  And as we talked about in voir dire, this law is

2  going to govern your deliberations.  This law is going to tell

3  you whether or not these charges have been proven.  And these

4  instructions that you will have guide you and will lead you to

5  the only conclusion supported by the evidence in this case, and

6  that is that Mr. Castle is not guilty of what he's being

7  accused of.

8          One thing the Court's going to tell you is you have to

9  follow the law.  You have to follow it even if it doesn't feel

10  right, even if you disagree with it, even if Mr. Castle made

11  some money off this, a lot of money, even if all of those

12  things, if the government failed to prove their case, they

13  failed it.  And no amount of bias or sympathy or prejudice or

14  whatever the emotional aspect of this is, and we talked about

15  that in voir dire, you can't let feelings, you can't let

16  emotion take over.  And you can't let those things affect how

17  you make decisions in this case.

18          So a lot was said about Mr. Castle's role, about what

19  the evidence showed about what he did.  Well, think about it.

20  What did the evidence show about that?  What was Mr. Castle's

21  role?  You heard from Mr. Castle himself.  You heard Mr. Castle

22  talk about ten-plus years ago he began doing research.  He

23  began talking to people, began doing reading, and to some

24  extent looking into the law because of what was happening at

25  that period of time, this mortgage crisis that was going on,

1  the fact that many homeowners were being affected by the market

2  and more specifically its crash.

3          So Mr. Castle told you about all of those things, and

4  he told you that with that in mind that he began to realize in

5  reviewing banking and reviewing lending and things of that

6  nature and from what he understood the law to be, from what he

7  read in various books, from what he heard from different

8  people, there were some problems.  There were some problems in

9  the way the banks were lending money and tying properties to

10  deeds of trust, promissory notes, accounting, all these

11  different things.  So he began to think to himself how can I

12  provide some relief.  How can I help somebody who is being

13  essentially victimized by what he perceives to be bank

14  irregularities.

15          So he did that.  He researched it.  He had some ideas,

16  bounced them off various people in the industry.  Ultimately he

17  came up with a respected process that could help some people.

18          But what was the process that he is the one who

19  created it?  Well, you heard from Mr. Castle.  You heard from

20  Mr. Kirkpatrick that Mr. Castle's role in all of this was

21  really minimal or insignificant.  Mr. Castle's role in this was

22  the creation of some letters, templates of some letters that

23  could be sent to the banks questioning them, challenging them

24  on their lending and how it could relate to an individual, and

25  that's what he did.

1         And you heard about the series of letters that went

2    out.  Mr. Kirkpatrick told you about it.  Mr. Castle told you

3    about it.  But the initial letter essentially is notifying the

4    bank, hey, there's a problem here, or at the very least, there

5    appears to be a problem here.  So we are demanding of you on

6    behalf of the homeowner to provide all this information to us.

7    And what the letter also tells the bank in this first letter

8    is, if you don't respond to this, if you don't answer these

9    questions, provide this documentation, there may be significant

10   consequences to you.  And the letter says that in various

11   places.  One example of letter one, it says the failure to

12   respond in the time provided will ensure abandonment of claim,

13   which is the deed of trust, or abandonment of rights to collect

14   on the deed of trust.  I'm paraphrasing but that's what this

15   document is telling the banks.

16        Once that letter was sent, and it's sent certified

17   mail, a follow-up letter is sent essentially advising the banks

18   again, look, we sent this letter out to you.  You haven't

19   responded.  We're going to give you an additional time to

20   respond.  But if you don't respond, you are essentially saying

21   all our allegations are true, and you are agreeing to

22   essentially relinquish your claim to the deed of trust.  You

23   will have these letters.  You can see them in detail, but

24   essentially, that's what is being said in these letters.

25        The third letter is the actual notice of default, and

1  the banks consent that judgment can be entered against them.

2  Again, telling the banks you haven't responded.  We gave you a

3  chance now.  Your claim against this borrower is now satisfied.

4  And you may remember during Mr. Castle's

5  cross-examination that word "satisfied" was important because a

6  deed of trust can be satisfied by either the paying of money or

7  some other way of satisfaction.  And so these documents are

8  telling the bank your deed of trust insofar as this borrower

9  has been satisfied.

10  The last document that went out was essentially a

11  judgment, as Mr. Castle called it, a judgment nihil dicit, and

12  this is telling the bank again.  Not hiding anything from the

13  banks.  These are all certified letters from the various

14  principals of the various lenders.  And remember Mr. Castle's

15  role in the letters was simply at the outset at the very

16  beginning creating the framework that these letters could go

17  out to the banks and that the failure of the bank to respond

18  constituted a waiver and deemed it full satisfaction of the

19  deed of trust, and all that did according to these letters was

20  to tell the banks this is what happened.  Judgment has been

21  entered.  You cannot now take any collection action against the

22  borrowers.  You are now precluded from any taking any

23  collection action against the borrowers.  And that's it.

24  That's all these letters did.  They essentially wiped out the

25  debt, at least in this letter form, of the borrower.

1          And that is the idea that Mr. Castle took to

2    Ms. Trites.  Remember Ms. Trites is the one with the real

3    estate background.  Ms. Trites is the one who was the broker.

4    She heard Mr. Castle out regarding these letters.  She heard

5    him talk about the various laws that support a lack of response

6    to the letters equals satisfaction of the debt, and that

7    intrigued her.  She told you that.  So then she took that

8    information.  She took Mr. Castle's proprietary information

9    regarding essentially forgiving a debt on behalf of a

10   homeowner.

11         And it was argued over and over again that Mr. Castle

12   was the leader of this quote, unquote, scheme.  Well, we know

13   that's not true.  We heard from one person and one person only

14   that Mr. Castle was the leader of this scheme.  And who was

15   that?  Ms. Trites.  Ms. Trites was the one who said Mr. Castle

16   is in charge here.  But remember she was testifying pursuant to

17   a plea agreement.  She was testifying on behalf of the

18   government with the hope that if she can get Mr. Castle that

19   the government will then make a recommendation on her behalf

20   when she testifies -- strike that -- when she is sentenced next

21   month.

22         And that's important.  And the law -- and the judge

23   will read to you, you should consider that.  You should

24   consider whether or not she gets a benefit from what she's

25   saying.  And the Court also tells you because of that obvious

1    bias that you have to consider her or you should consider her

2    testimony with much greater caution than anybody else.

3            But we know even beyond the obvious motivation to

4    exaggerate Mr. Castle's role and to minimize her role.

5    Remember she said I basically did what Chris told me.  I was

6    just there doing what he said.  Not true.  We know that she's

7    lying about that, and we know that from Mr. Kirkpatrick.

8    Mr. Kirkpatrick was very detailed as to who had what role.  He

9    specifically said Mr. Castle's role, minimal, if at all.

10   Mr. Castle explained to me these letters and the law behind

11   them, but Ms. Trites, she is the one.  She is the one who ran

12   this show.  She is the one who brought in the idea of these

13   deeds of trust.  She is the one who brought in this idea of the

14   other recorded documents, Ms. Trites did.  Mr. Kirkpatrick told

15   you that.  Mr. Castle told you that.  She was the one who

16   created the verbiage for these recorded documents.  You heard

17   that from Mr. Kirkpatrick.  She was the one who created the

18   format for all of the recorded documents.  You heard that also

19   from Mr. Kirkpatrick.  She was the one who sent the documents

20   to other people for execution.  Mr. Kirkpatrick told you that.

21   She is the one who found people to sign these documents.  She

22   is the one who caused these documents to be recorded.

23           She was the one, not Mr. Castle, and that is what the

24   evidence shows.  That is what you heard.  Because there is no

25   evidence that Mr. Castle was in any way in charge of this.  He

1   brought the idea to Ms. Trites for sure.  He brought in the

2   idea of these letters and the judgment nihil dicit, absolutely.

3   But that's not what he's being charged with.  He's being

4   charged with the recording of these bank institutional

5   documents.  And he had no role.  He had no role in the

6   execution or the recording of any of those documents.  No

7   matter how many times the government says he did, ask yourself

8   where is the evidence of it.  Getting money for his information

9   about these letters, getting money through the escrow process

10  doesn't create evidence.  And that's what the argument

11  essentially is by the government.

12          Look, he made all this money.  He made hundreds of

13  thousands of dollars, so he had to have known.  He must have

14  known.  Well, that's not their burden here.  Their burden is

15  I'm convinced beyond a reasonable doubt that he knew, and there

16  simply is a lack of evidence that supports any finding in that

17  regard.

18          The first count -- and there are various counts, and

19  you can see that in the verdict forms that you will get.

20  Count 1 is the overall conspiracy allegation.  And I agree that

21  that really is an umbrella for the other two categories of

22  charges against Mr. Castle.  The first category is counts 2

23  through 16, and it's the false making of bonds and instruments.

24  There's a chart directly in front of you that's a blown-up

25  chart.  That's the exact same thing that's up on the screen

1   right now.  And this document identifies all of the properties,

2   all of the homeowners that relate to counts 2 through 16.

3          And I agree the analysis for counts 2 through 16 is

4   the same, and that is whether or not Mr. Castle caused to be

5   filed the deeds of reconveyance that are at issue here.  And as

6   you go through them, the obvious answer is no.  Did he

7   personally cause any of these documents to be recorded?  No.

8   There is one exhibit that you saw, and it relates to Joan

9   Hangarter.  And that was the Notice of Rescission of Notice of

10  Default.  You might remember that.  The government focused on

11  that a lot.  He's not being charged with that.  In relation to

12  Joan Hangarter, he's being charged with the deeds of

13  reconveyance, and that is it, setting aside whether or not he

14  signed it, setting aside whether the people have proved that,

15  because they haven't.

16         And at any point during my argument where I say the

17  facts to be a certain way or I argue that the law is a certain

18  way, obviously it's just me, and my interpretation.  You're

19  free to ask questions if you have them, not to me, but as

20  you're deliberating.  If there's ever a question about

21  something I said or Ms. Syed or Ms. Hemesath says, you can ask.

22  Same thing with the law that I'm arguing, you can ask, and

23  you'll get a more specific question.

24         But as you go through each of these counts, did

25  Mr. Castle do anything personally?  The government concedes

1    this.  The answer is no.  He didn't cause any of these

2    documents to be recorded.  Then the other issue is, and I

3    agree, to be found guilty of a crime including crimes like

4    this, you don't have to personally commit the crime.  You can

5    be guilty of that if you aid and abet another person in the

6    commission of that crime.  So that's the question.  As to

7    counts 2 through 16, did the government prove that Mr. Castle

8    aided and abetted the commission of counts 2 through 16.

9         Well, aiding and abetting, pretty simple, the

10   government has to prove that somebody caused to be filed a

11   false document.  That's the first thing.  That's your first

12   question to yourself.  Did somebody do that?  Well, we know

13   somebody did, right?  Somebody walked into the recorder's

14   office and recorded it.  But that doesn't mean that's the end

15   of that analysis because -- and you will read what you consider

16   in evaluating this stuff.

17        So as to element number 1, the somebody who recorded

18   this, the government has to prove that that person, whoever it

19   was, whether it be the individual like Ms. Merritt who signed

20   it or the person who walked this into the recorder, whoever it

21   was, the government has to prove that that person when they

22   signed and recorded that document, they knew.  They knew that

23   that was a false document.  And we have no evidence of that.

24        We heard from Ms. Hansen and Ms. Merritt who said, oh,

25   we signed these documents because I was asked to by a friend,

1    but we know that Tisha is the one who called the friend to have

2    them sign it, but they said we didn't read it.  We just signed

3    it, and it was done.  Well, if that's the case, if that's the

4    case, element number 1 has not been proven because the law

5    tells you you may not find that a person here, the one who

6    recorded this document, acted knowingly if you find that he or

7    she actually believed that the recorded documents at issue did

8    not contain false statements, or if you find that a person who

9    recorded these documents, whoever it was, was simply negligent

10   for not reading it, careless for not reading it, foolish for

11   not reading it.  Talk about checking boxes, theirs are all

12   checked there.  It's careless, foolish, at the very least

13   negligent.  But because the people haven't proved that the

14   actual person who recorded this knew what they were doing, the

15   answer to question number 1 is no, and that ends the analysis.

16   You don't have to go to question number 2, 3, or 4.

17          But even if you did, even if you did, you have to --

18   the next question is did Mr. Castle counsel, command, induce,

19   procure, direct, cause that person to be the making of -- the

20   recording of false bonds or obligations.  Well, again, there

21   has been no evidence at all that Mr. Castle had any contact

22   with these individuals, that he directed them to do anything,

23   that he encouraged them to do anything.  And we're talking

24   about the person.  These instructions are very clear, and

25   they're very literal; and you have to follow their literal

1    interpretation.

2          When we're talking about aiding and abetting, you're

3    talking about the actual person who did the recording.  And

4    there is a complete lack of evidence that Mr. Castle had any

5    contact with these people or even knew who they were.  So

6    again, we don't get to 2 because number 1 is a no, but number 2

7    is a no.

8          Then lastly, again assuming that you get to 3, which

9    you can't based on this evidence, did Mr. Castle act with the

10   intent to facilitate the false making of bonds or obligations.

11   Well, the short answer to that is no.  And how do we know that?

12   Keep in mind the cross-examination of Mr. Castle, and every

13   question regarding the recorded documents to Mr. Castle by

14   Ms. Hemesath was a loaded question.  It was basically admit

15   that you filed this false document.  Admit that the information

16   in this deed of reconveyance is not true.  But every single

17   time, every single time that she asked one of those kinds of

18   questions, he never said yes.  He said no.

19         The information is not false.  The document is

20   legitimate.  And we know where that comes from.  We know that

21   because of the whole letter process, the whole judgment

22   process, everything that he knew in his mind, although he had

23   no role in it, he didn't see anything wrong with it.  And

24   again, if that's how he felt, which obviously he did, then the

25   answer to question number 3 is no.

1          So every single element -- and the fourth one is

2     essentially did his conduct help the person who recorded it.

3     That's a no also.

4          And again, one no in these series of four questions is

5     a not guilty on counts 2 through 16.  And the analysis is true

6     for all of those counts, all of those properties, all of those

7     homeowners.  Counts 17 through 24, 26 through 31, 33 through

8     39, again the same analysis.  Did Mr. Castle personally do

9     these things?  No.

10         Did he aid and abet them?  Again, we're still talking

11    about the recorded documents, and that is the scheme we're

12    talking about.  To the extent the government now is going to

13    argue in rebuttal that actually the scheme is the letters and

14    introducing those letters to Tisha and then potentially going

15    to a dinner in Vegas, a house in Burlingame where Mr. Castle

16    explained these letters and the significance of them, to the

17    extent that the government argues that these emails that we

18    saw, they make a big deal about, somehow changes things, again

19    we know from what Mr. Castle told you, we know from

20    Mr. Kirkpatrick, and we know from the documents that Tisha had

21    other people sign that Mr. Castle's role in this was minimal.

22    He was basically consulting, providing information about these

23    letters and then now and again answering a question.  That is

24    not aiding and abetting.  That is not starting a scheme to

25    defraud.  That is what the government has to prove beyond a

1    reasonable doubt.

2            And as you go through all of these counts one by one

3    by one, the only answer is that they have utterly failed in

4    their obligation.  Mr. Ramsey, potentially maybe Ms. Hangarter

5    had one conversation, maybe two with Mr. Castle, but what did

6    they tell you?  We know that Mr. Ramsey said something to the

7    effect of he's the closer, but on cross-examination he talked

8    about what he meant by that.  Mr. Castle came in, talked about

9    these letters, talked about the law, talked about the UCC

10   codes, and based on all of that he felt comfortable signing

11   them.  The one thing he didn't say, one thing that

12   Ms. Hangarter didn't say was that when Mr. Castle answered

13   these generic questions about the letters, did he ever mention

14   anything about the recording of documents, about the recording

15   of deeds of trust, about the recording of deeds of reconveyance

16   because he never did that.  That was one person and one person

17   only and that's Tisha.  And so for those reasons as to the

18   second category of documents, Mr. Castle is likewise not guilty

19   of these charges.

20           And then this brings you back to the overall

21   conspiracy count.  As Ms. Syed said, and I assume Ms. Hemesath

22   will say once she gets up here, this is just relative to the

23   other two, and because there is no other two, there is no other

24   one.  There is no conspiracy here as to anything that's being

25   alleged by the government.  And because there's no conspiracy,

1    Mr. Castle is also not guilty of that count.

2            During the course of this case you heard evidence of

3    other things that Mr. Castle may have recorded, specifically

4    the property relating to Curtis Guillotte, but that's not a

5    charge here.  That's not something you consider here.  You

6    heard it, but as the Court will tell you, you are only here to

7    determine whether Mr. Castle is guilty or not of the charges in

8    the indictment.

9            Mr. Castle is not on trial for any other conduct not

10   charged in the indictment.  So for all of those reasons,

11   because the government has failed in its burden of proof,

12   Mr. Castle is entitled to a not guilty verdict on this.

13           And it doesn't matter that he made money.  It doesn't

14   matter that he sent escrow instructions after the fact.  It

15   doesn't matter if a forensic accountant says it appears to me

16   he has control of this account, even though Ms. Trites herself

17   contradicted that.  But be that as it may, even though all

18   those things, if you grab them all together, you can't use

19   those things to come to a conclusion that the government has

20   met its burden of proof here because they haven't.

21           You heard the evidence.  Soon you will hear the law

22   that applies to this case, and soon you will begin

23   deliberations.  And based on what the evidence actually is, at

24   the end of your deliberations, I ask that you render the only

25   verdict supported by the facts and the law, and that is that

1   Mr. Castle is not guilty of all the counts in the indictment

2   against him.

3            Thank you, your Honor.

4            THE COURT:  Okay.  Ms. Hemesath, rebuttal.

5            MS. HEMESATH:  Thank you very much, your Honor.  Let's

6   start with this idea that Mr. Castle tried to pitch to you at

7   the beginning of this trial which is that he is just an idea

8   man, that he had this idea involving these three letters to the

9   banks, and the other people that you've heard from and about

10  took this idea and made it their own; and he was separate and

11  apart from that even though he got all the money at the end of

12  it.

13           The idea that he is just an idea man, that's him

14  bringing his fraud to you here in the courtroom.  Even if that

15  were true that all he had was the idea for this process which

16  he himself called the mortgage elimination program and at the

17  end of it he got the money, that could be enough.  That could

18  be enough for you to convict on all the counts.  It's just not

19  a defense that all you are is the idea people -- person, and

20  other people execute the scheme on your behalf; and you get the

21  money.  That does not mean you are innocent.

22           The second problem that Mr. Castle has is it's just

23  not true that he's only the idea man.  There are stubborn facts

24  throughout this entire case that you have seen.  They are like

25  the sticky fingerprints that he left because this scheme, while

1   basically simple in the idea, we're going to file these false

2   deeds on the county recorder's offices and then sell the

3   properties quickly while the bank's not looking, the execution

4   of that took some administrative attention, took -- you had to

5   pay attention to the details.  To make it work, you had to

6   erase every bank off of title.  You had to get your own deed on

7   in time, and you had to make it work across a group of people

8   working all over the country to get this right so that you

9   could take the money at the end.  And to do that, it was I

10  submit to you, an all-hands-on-deck-type situation.  When

11  something was needed, Mr. Castle, you can see, was there.  He

12  was there in the emails.  He was there in a handful of the

13  recorded documents, and of course he's there at the end getting

14  the money.

15        The idea that -- and we're going to look at some of

16  those in just a moment, but I want to bring us to these three

17  letters again.  The three letters, the church, this UCC code

18  thing, all of these kind of weird aspects to the program, they

19  don't mean anything.  The only way this program actually

20  worked -- and I'm going to use program in air quotes, the

21  mortgage elimination program.  The only way it really worked

22  was by filing the fake deeds of trust at the county recorder's

23  office and the fake deeds of reconveyance.  With those, you go

24  to escrow.  You sell it.  You don't need any of that other

25  stuff.  You don't need the letters to the banks.  You don't

1     need the church.  You don't need your references to UCC codes.

2           What those do is help bring other people into the

3     program.  Imagine if they had gone to the homeowners and said

4     we've got this idea.  We're going to record a fake deed of

5     trust on your property.  Then we're going to record a fake deed

6     of reconveyance pretending that we're Bank of America and that

7     you don't owe Bank of America a loan anymore, and then we're

8     going to sell it as if we're actually owed money; and we're

9     going to get all the sales proceeds and divide it up.  Who

10    would sign up for that?  Nobody would sign up for that.

11          As my co-counsel said, as Mr. Ortiz said, as the judge

12    will instruct you, you bring your common sense with you into

13    the jury deliberation room.  You don't check it at the doors

14    when you come into the courtroom.  Your common sense tells you

15    that's not enough to bring all the many, many people that you

16    heard about into this scheme willingly.

17          What those things did, what Mr. Castle's ideas did,

18    what his smooth talking did was to give people an impression

19    that this was all somehow okay and to compartmentalize it to

20    keep certain people away from the dangerous knowledge of where

21    the fraud really was here and to allow people to appease

22    themselves with, well, my role is only this and my role is only

23    this.  And I don't know about those other things, and so

24    therefore, it's not that big a deal.  And I'm willing to look

25    the other way because I really need this help, and I need this

1    money.  That's what Mr. Castle's role was.

2         The three letters, it's window dressing.  It allows

3    him to dress up this idea of bank fraud, of filing falsely

4    recorded documents into something that's more palatable to

5    people who are desperate, who are looking for help, to his

6    coconspirators who are willing to join in with him on this

7    journey because he sounds authoritative.

8         He sat there and he testified and he wanted to explain

9    to you, to you that these three letters were somehow legally

10   significant, that it somehow would persuade the banks that they

11   were going to say, okay, you're right.  You get to own your

12   house free and clear.

13        You are the people who are the ones charged with

14   remembering what happened at trial over these last three weeks.

15   Your memory controls.  What I say ultimately doesn't matter.

16   What Ms. Syed said doesn't matter.  What Mr. Ortiz said doesn't

17   matter.  It's your memory of what was said.  Was there any

18   evidence that was said that these three letters were somehow

19   legally significant.  I submit to you the answer is a clear no.

20        It's not a crime to send the three letters.

21   Mr. Castle could have sent as many letters as he wants.  The

22   homeowners can send letters to the banks corresponding with the

23   banks.

24        The problem begins with the fake deed of trust that is

25   filed just days after they're recruiting these homeowners into

1    the program.  Remember we went through the exercise a couple of

2    times of where we looked at how close in time the membership

3    document was signed bringing the homeowner into the program and

4    how close the deed of trust was filed at the county recorder's

5    office.  It's just days away, five, ten days.  The three

6    letters, it's a distraction.  They're not waiting for the banks

7    to engage with them on that.  They're starting with the fraud

8    right away as soon as they have a homeowner in hand.  The three

9    letters gave the homeowners comfort.  It may have given

10   Mr. Castle's coconspirators some comfort.  It may have given

11   him some comfort, but it has nothing to do with the deed of

12   trusts filed at the county recorder's office were authorized,

13   were legitimate, and how the actual function of the fraud was

14   played out.

15        Let's look at what I call the stubborn facts in the

16   case.  Could we pull up Government's Exhibit 98, please.

17        Did that come up for you?  Okay.  Great.

18        Let's remember this one.  In this email Mr. Castle is

19   receiving information.  Let me turn this one so I can see what

20   you're looking at too.  Hopefully you can see it on your

21   screens in front of you.  If not, it's in your binder, and you

22   can look at it a little more closely.  But in this one, he is

23   receiving information from Tisha Trites about the status of the

24   title on each of these properties, and in it you can see right

25   in the middle of the section he says, correct, need the signed

1    documents.  So this is Mr. Castle right in the middle of the

2    fraud scheme indicating that in order to make the county

3    recorder aspect of this work signed documents were needed.  So

4    he's inserting himself on three specific properties during the

5    time that the properties are in the process of being sold.

6         If we can go back out there.  That's in the weeds.

7    And if we look at page 2.  Oh, there we go, at the bottom there

8    you see the attachment that's actually being sent, that's the

9    signed copy right there.  That's not an ideas guy.  That's a

10   details guy.  That's somebody who is involved in the actual

11   process of making sure they have everything they think they

12   need to get this scheme working.

13        Let's look at Exhibit 1022.  These contracts, and

14   there are a few of them that the homeowners are required to

15   sign, this is one of them.  This is the nondisclosure one.  Why

16   do you need a nondisclosure agreement if you truly believe in

17   your program?  One possibility is what Ms. Trites told you,

18   that Castle didn't want anybody else stealing his idea.  He

19   didn't want anybody else to have their own scheme where they

20   filed false documents.  Another possibility is that they didn't

21   want the wrong people, law enforcement, to learn about what

22   they were doing.  And so the homeowners are instructed very

23   strictly and required to execute something saying I'm not going

24   to tell anybody about this.  I understand this is very

25   sensitive.  We're going the do this under the dark of night.

1          The contracts that have Mr. Castle's name stamped on

2     them, why do you need a contract if all you're doing is giving

3     people an idea?  I invite you to look at the contract.  They're

4     very specific.  They say who is going to do what role.  They

5     say, which Mr. Castle actually acknowledged, this is legally

6     risky.  No attorney has signed off on this.  It's giving some

7     caution but not enough caution.  There's nothing in the

8     contract saying our program is actually we are filing these

9     three fake documents at the county recorder's office and then

10    putting the house into escrow.  They're filled with enough

11    gobbledygook.  It's another example of window dressing.  It's

12    giving the homeowners some appeasement that this is okay.  It's

13    a real thing.  It's a formal thing I'm involved in.  These

14    people know what they're doing.

15         That's Mr. Castle's contribution.  He is on all of

16    those contracts, and whether he signed them himself or whether

17    he had somebody stamp his name on them, that's just delegating.

18    That's just being someone at the top.  Having somebody else do

19    the paperwork.  Nobody wants to do all the paperwork.  It takes

20    organizational skills.  It takes diligence.  And it was

21    important to them for those reasons that I just said, that it

22    gives the homeowners a good feeling, and it also gives them a

23    little bit of teeth.  If the homeowners went sideways, maybe

24    you get out the contract and say we've got a contract.  This is

25    how we're going to split the proceeds at the end.

1          Again, they're in evidence.  You are the decider of

2   what weight to give the contracts, but I submit to you that's

3   the natural conclusion of the role of the contracts in this

4   process.

5          Let's bring up 1335, please.  This is another email

6   from Mr. Castle.  That's just the header there to orient you.

7   It's July 5th, 2011, during the scheme period.  And if we can

8   go to page 3, please.  This is the one where he says to

9   everybody in the group, you franchisees underneath me sign this

10  contract in blue ink, date it, and get it back to me.  It's

11  controlling.  It's saying you below me, we're going to try

12  something new.  We've got this new phase.  He's featuring there

13  certified copies, so new letter tweaks to our program along the

14  way.  He's not just an idea man.  It's not true that he's

15  sitting back talking about three letters to the banks.  He's

16  talking about you franchisees also profiting from this, let's

17  renew our agreement in this way.  That's important to him.

18         Let's look at 1302.  You've seen this a lot.  The last

19  time you're going to see it displayed on the big screen here.

20  Why is it important?  Mr. Ortiz is correct.  It's not charged

21  as a falsely made lending association document, but it is part

22  of the bank fraud charge on this property.  It's significant

23  because there was a notice of default filed on this property.

24  That's at 1308.  This document, 1302, gives the impression that

25  there is no longer a notice of default, that the bank is

1    satisfied, and that the property has only one entity on title.

2    That's one of their entities, the fake entity with the fake

3    deed of trust.

4         1601, please.  This is the deed of trust that we

5    submit to you is fake.  It's got Castle on it, his Oreplex

6    entity as a supposed lender.  Mr. Ortiz just suggested to you

7    the fact that this somehow was not a lie, was not a fraud, this

8    document, because somehow the bank was satisfied, and

9    therefore, he could put this document on title.

10        Ladies and gentlemen, I submit to you there is no

11   evidence that the banks were satisfied.  You heard from many

12   banks in this trial.  All of the banks that gave you testimony

13   said, no, no.  These mortgage loans weren't current.  They were

14   owing.  Some of them were in default in 2010-2011.  They wanted

15   their money.  They're a bank.  They are trying to foreclose on

16   these properties.  Mr. Castle may have in his mind some idea

17   that satisfaction is something different from payment, but I

18   submit to you there is no evidence of that.  And furthermore,

19   everything about this document, Exhibit 1601, is a fiction.

20   There is no loan owing.  The homeowner never entered into any

21   type of mortgage arrangement with Chris Castle's Oreplex.  The

22   document gets mailed back to him at his address, the Farmers

23   Lane address.  Even he didn't say, oh, I was very surprised by

24   this.  Oh, I had no idea this document was going to be filed.

25   Oh, I told Tisha don't use my name again, no.

41

1    There's another fake Castle deed of trust in evidence,

2    and that's at Exhibit 91.  So twice Castle is being used as a

3    fake lender.  That's another stubborn fact for him.  It means

4    he is not just an idea man.  He's in this at the very basic

5    level of being directly on some of the deeds of trust that are

6    being filed at the county recorder's office.  That's knowledge.

7    That's intent to defraud.

8    Let's look at 1630, page 2, more evidence of knowledge

9    and intent to defraud.  This is one of the realtors I think it

10   was said she was alerting Mr. Kirkpatrick, hey, we've got a

11   problem.  The banks are still trying to foreclose on these

12   properties, and I know new homeowners are going to be moving

13   into these properties.  What do we do?  If we can go to page 1.

14   There we have the response.  If we can just blow it up.  That's

15   Castle's response.  That's not good faith.  That is not just

16   being an idea man at the top.  That is saying, well, our plan

17   here is to get this sold as fast as possible so the horse can

18   leave the barn.  That's Mr. Castle there in the evidence for

19   you in real time.  And recall he didn't dispute that he

20   actually sent all of these emails.  This is his involvement at

21   the time.

22   And this is a sticky fact.  It doesn't depend on the

23   memory of any witness.  It doesn't depend on their incentive to

24   give testimony that they might consider to be favorable to the

25   prosecution.  It's there and there's no getting around it.

1          Let's look at one of the most difficult ones for

2    Mr. Castle.  It's 1745, page 2.  This is the email that

3    Mr. Castle is sending in directly from his own email to the

4    escrow agent, Michelle Marsico, pretending to be a lender.  He

5    is pretending to say, hey, on these two properties that are

6    going through escrow in your company, I'm the lender.  I am

7    owed this amount of money.  Please pay me.

8          And if we look at 1745, page 1, there's the demand

9    letter.  This is a lie, this document.  He's not owed any money

10   on the sale of this house.  He and his coconspirators made up

11   this price, according to whatever formula they used.  They said

12   to escrow, we're the lenders.  You owe us.  Here is how to pay

13   us.  They get the money, and they split it up.  That's bank

14   fraud.  That's a conspiracy.

15         Let's look at 1730, a revision of one of these demand

16   letters.  Do you remember what seemed to surprise Mr. Castle in

17   this -- oh, at the very top it's faxed either to or from his

18   house.  He said, oh, that's my home number.  Mr. Castle can't

19   distance himself from this document.  Whether Tisha told him

20   the price to put in or whether the escrow agent is the one who

21   actually typed the body of this document, it's coming through

22   him.  This is his involvement right in the heart of the bank

23   fraud, the conspiracy, not just on this property but on the

24   whole thing, on the whole thing.

25         Let's talk about aiding and abetting.  When this trial

1  is over and you're free to talk to your friends, you will be

2  able to say I now have mastered this new legal concept of

3  aiding and abetting, not just one type of aiding and abetting,

4  but there are two types of aiding and abetting.  Mr. Ortiz

5  talked to you about one type.  That's where you work through

6  another person who is also guilty.

7       There's a second type of aiding and abetting where you

8  work through another person who is innocent.  And so you may

9  have some examples of that second type in the people who were

10  signing on the fake deeds of reconveyance.

11       So for example, let's see, is it 104?  I believe this

12  is the Brianna Hansen one.  She was a fairly young person, if

13  you subtract ten years from when you saw her on the stand to

14  when this happened.  She was working at Old Navy.  Did she sign

15  it before she read it, did she not, that's up you to you do

16  decide.  I submit to you it really doesn't matter.  Mr. Castle

17  is guilty either way.  She's taking 40 bucks per document to

18  just put her name on something.  Did Mr. Castle willfully cause

19  this document to be filed?  I submit to you the answer is

20  absolutely yes.

21       Remember how Remus Kirkpatrick told you he wanted

22  nothing to do with these documents.  He knew this was the hot

23  document in this case, and he wanted to separate it from

24  himself as far as he could.  And so you see layers in between.

25  There's the person whose name is actually on the document.  She

1    got 40 bucks.  That's obviously a fraud, this document.  Nobody

2    here is saying this is a true document.

3           Then it goes Laura Pezzi, I think you heard that name.

4    That's the one who actually asked her, hey, will you sign this.

5    Above her there's Remus Kirkpatrick.  He says, oh, hot doc,

6    yes, I need this document to make the whole thing work, but I'm

7    going to stay over here in my lane and just not think about

8    that document too hard.

9           And then at the top you have Mr. Castle.  Of course he

10   knows these documents are needed for his scheme.  Of course he

11   can't avoid culpability by putting as many people in between

12   himself and this hot document as possible.  That's what the law

13   tells you.  You will hear the instruction from the judge.

14   You'll have it.

15          There's two types of aiding and abetting.  Both are at

16   play here.  Both involve the same concept, and that is, if

17   Mr. Castle has in his mind that this is something that he

18   wishes to bring about, bank fraud, filing these false deeds at

19   the county recorder's office, and he takes action to make it

20   succeed.  And the action can be as simple as recruiting

21   Tisha Trites to get all these documents filed.  The action can

22   be as simple as saying, hey, you franchisees, you're

23   responsible for doing what's required for getting these people

24   to sign these documents.  I'm too important.  I am too big over

25   here with my big ideas about banks.  I don't want to go out and

1    pound the pavement and find these people in all these different

2    counties to make this work.

3              Of course he's still responsible for that.  It's his

4    state of mind that extends across the entire crime.  Certainly

5    he knows these documents are being filed.  You didn't hear any

6    indication when he testified that he was surprised or shocked

7    to learn that this is how this worked.  No, he's clever.  He's

8    trying in 2010 to anticipate that, boy, if I could just get a

9    chain of people in between myself and these documents, maybe

10   I'll be okay.  He has embraced the crime of another and

11   consciously done something to contribute to its success.  That

12   is what happened here.  That is aiding and abetting, and that

13   is why he is guilty, even though he never signed any of the

14   deeds of reconveyance that are the subject of the falsely

15   making bank writing counts.

16             I think the idea of helping homeowners, you've heard

17   it several times throughout the trial.  That's telling you a

18   half-truth, that he's in this to help homeowners.  I submit to

19   you you can hold in your mind a noble idea to help homeowners.

20   You can also easily hold in your mind the idea that you want to

21   make money off of this.  Nobody has disputed that throughout

22   this trial.  It's a dual purpose.  And that the charts

23   contained information about whether or not the homeowners

24   received money, it's clear those summary charts you have in

25   evidence are for assisting you in your analysis of Mr. Castle's

1   role.  He's the one on trial here.  That's where your focus

2   should be.  Trying to divert your attention to whether the

3   homeowners were or were not helped, that's a distraction from

4   the task that you have at hand.

5            I want to talk to you very briefly before I wrap up

6   about two more things, corroboration and flight.  For

7   corroboration, Mr. Ortiz suggested that our case hangs on the

8   word of Tisha Trites, and I submit to you that's simply not

9   accurate.  It's simply not accurate.  Was she helpful to give

10  you background about how all of this worked, absolutely.  But

11  our case, it's in the documents.  It's in the emails that you

12  have.  It's on these hot recorded documents that Mr. Castle

13  himself filed.  Those all corroborate what she told you

14  Mr. Castle's role was at the time.  You won't see any

15  inconsistency between what she told you that role was and what

16  you see in the documents yourself.

17           Mr. Kirkpatrick also gave his memory of how it worked

18  at the time.  His memory was that he worked a lot with

19  Tisha Trites.  I submit to you that's by design.  Mr. Castle

20  doesn't want to be in the day-to-day unless he has to be,

21  unless somebody comes to him with a problem.  And you see in

22  the emails Kirkpatrick did come to him with a problem.  That's

23  not the bulk of what Mr. Kirkpatrick's memories are.  That

24  doesn't make Castle any less culpable.  It simply means he

25  found a good coconspirator to commit the crime with.

1          The emails, the shared bank accounts, the perception

2     of other witnesses, Joan Hangarter, Erik Ramsey, the name of

3     the group itself, CCTT, these are all overlapping layers of

4     corroborating evidence.  You don't have to believe Trites in

5     order to convict.  There is a lot of evidence here that all

6     hangs together pointing toward a verdict of guilty on all

7     counts.

8          There's also the conspiracy.  Mr. Ortiz suggested to

9     you you could disregard some of the properties that were talked

10    about.  Every property you heard about here, every homeowner

11    including Curtis Guillotte.  That's all evidence of where the

12    program was going nationwide, all evidence of the conspiracy.

13    It's all fair game for you to consider in your deliberations.

14         Let's talk about the flight to Australia and

15    New Zealand.  That is evidence, I submit to you, of

16    Mr. Castle's consciousness of guilt.  He left in the fall of

17    2011.  He left his coconspirators holding the bag.  He left

18    when even he said he knew at least one lawsuit had been filed.

19    There were problems with the title companies.  There were

20    problems with the county recorder's office, and you see that

21    within the documents.  He left with that knowledge.  He packed

22    up his entire family.  He packed up his belongings.  He took

23    off for New Zealand, and he left his coconspirators to try to

24    sort this all out.

25         Please consider that evidence, not what he told you,

1    that it's a convenient time to take a vacation but as evidence

2    that he consciously knew all along that this was a scheme to

3    defraud, a scheme to file falsely recorded documents, a

4    conspiracy, and it was just a matter of time until he got

5    caught.

6              Thank you very much.

7              (End excerpt.)

8                            --oOo--

9    I certify that the foregoing is a correct transcript from the

10   record of proceedings in the above-entitled matter.

11                         /s/ Kacy Parker Barajas
                           _____
12                         KACY PARKER BARAJAS
                           CSR No. 10915, RMR, CRR, CRC
13

14

15

16

17

18

19

20

21

22

23

24

25